Cyrus M. Sanai, SB#150387
SANAIS
9440 Santa Monica Boulevard
#301
Beverly Hills, CA 90210
Telephone: (310) 717-9840
cyrus@sanaislaw.com

IN PRO PER

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

CYRUS SANAI, an individual

    Plaintiff,

  vs.

LEONDRA KRUGER, an individual,
sued in her individual and official
capacities; JOSHUA P. GROBAN, an
individual sued in his individual and
official capacities; MARTIN J.
JENKINS, an individual sued in his
individual and official capacities; KELLI
M. EVANS, an individual sued in her
individual and official capacities;
CAROL A. CORRIGAN, an individual
sued in her individual and official
capacities; GOODWIN H. LIU, an
individual sued in his individual and
official capacities, PATRICIA
GUERRERO, an individual sued in her
individual and official capacities and
DOES 1 through 10, sued in their
individual and official capacities
inclusive,

Defendants.

Case No.  23-cv-01057-AMO

**AMENDED EX PARTE MOTION
FOR ENTRY OF DEFAULT
JUDGMENT;
DECLARATIONS AND EXHIBITS
FILED SEPARATELY**

TO THE CLERK OF THE COURT

Plaintiff Cyrus Sanai ("Sanai") hereby moves this Court for entry of a default judgment in this case on an emergency *ex parte* basis against Defendants LEONDRA KRUGER, JOSHUA P GROBAN, MARTIN J JENKINS, KELLI M. EVANS, CAROL A. CORRIGAN, GOODWIN H. LUI and PATRICIA GUERRERO ("Defendants") as follows:

1. A declaratory judgment against all defendants that:

    a. under *Bracy v. Gramley,* 520 U.S. 899 (1997), Sanai and anyone similarly situated to him has the right to obtain documentary evidence and conduct depositions and have testify at trial members of the judicial branch regarding bias in judicial or administrative proceedings; and that, in particular but without limitation, the admissions of the State Bar and other evidence publicly revealed give adequate grounds for comprehensive discovery against the State Bar and members of the California State judiciary regarding their relationship with Tom Girardi, his law firm Girardi Keese, and agents and colleagues such as Tom Layton, , and as there are both no procedures allowing Sanai to adequately present these matters to the California Supreme Court as of right and his demands for discretionary discovery were denied by the California Supreme Court, the California Supreme Court's March 15, 2023 and May 31, 2023 suspension orders issued by Defendants are unconstitutional and invalid;

    b. the California Supreme Court's holding in *People v. Guerra,* 37 Cal.4th 1067, 1112 (2006) and similar authority, including without limitation *Roitz v. Coldwell Banker Residential Brokerage Co.,* 62 Cal.App.4th 716, 724 (1998) and *Jack Farenbaugh & Son v. Belmont Construction, Inc.* 194 Cal. App.3d 1023, 1031 (1987)(collectively "*Guerra*") are unconstitutional in that the rulings and actions of a state court tribunal on their own may be used to prove actual bias or bias under the federal standard; in the instant litigation, the second State Bar Court Judge assigned, Cynthia Valenzuela, demonstrated bias by explicitly refusing to

AMENDED EX PARTE MOTION FOR ENTRY OF DEFAULT JUDGMENT

acknowledge the correctness of the prior State Bar Court Judge's exoneration of Sanai on eight of nine counts due to his demonstrating collusion between a Superior Court Judge, Terry Greene, and opposing counsel and for successfully obtaining such dismissals and by doubling the requested suspension by finding a pattern of misconduct while barring Sanai from addressing such unproven allegations; because Sanai sought to enforce such rights and was denied such discovery which prejudiced him, the California Supreme Court's March 15, 2023 and May 31, 2023 suspension orders issued by Defendants are unconstitutional and invalid.

c.     the State Bar Court Rules of Procedure are unconstitutional in that they do not provide for constitutionally adequate discovery and rights to call and examine witnesses sufficient to protect the constitutional rights to impartial tribunals under federal and California standards, and they do not provide for enforcement of violations of the statutory obligations of disclosure required of the State Bar under Bus & Prof Code §6085(b), and because Sanai sought to enforce such rights and was denied such discovery which prejudiced him, the California Supreme Court's March 15, 2023 and May 31, 2023 suspension orders issued by Defendants are invalid;

d.     the California Supreme Court's authority barring discovery against appellate justices and filing recusal motions are unconstitutional and invalid; and

e.     the prosecution of Sanai by the Office of Chief Trial Counsel of the State Bar was unconstitutional under *Bracy v. Gramley,* 520 U.S. 899 (1997), because Sanai was denied exculpatory evidence required to be produced under state law and adequate opportunity for discovery and to call/examine witnesses, and therefore the California Supreme Court's March 15, 2023 and May 31, 2023 suspension orders issued by Defendants are unconstitutional and invalid invalid.

2.     Defendants, their officers, agents, servants, employees, and all persons acting in

AMENDED EX PARTE MOTION FOR ENTRY OF DEFAULT JUDGMENT

active concert or participation with them who receive actual notice of this injunction by personal service or otherwise, are hereby permanently enjoined as follows:

a.   all ongoing disciplinary proceedings at the time the Complaint was filed and discipline imposed against Sanai thereafter by the Defendants and their agents, including the State Bar, are enjoined;

b.   notwithstanding 2(a), any ongoing disciplinary proceedings at the time the Complaint was filed (except as to previously dismissed charges) shall, if at all, be held in front of a new State Bar Court judge with Sanai entitled to have full discovery and witnesses that would be available in a civil trial, criminal trial, or both, and the new State Bar Court judge will be ordered to accept the validity of prior dismissals;

c.   *Guerra* is unconstitutional and so the Defendants shall not address or hear any matter involving Sanai as party or counsel and shall recuse themselves from such matter unless the Judicial Council has created Rules of Court providing that state court jurists' statements and rulings may be entered as proof of bias or Defendants otherwise enter an order granting such rights to Sanai specifically in any litigation in which he is involved as party or counsel;

d.   the California Supreme Court's authority barring discovery against appellate justices and prescribing no procedures for filing recusal motions or obtaining review that imposes the federal standard articulated in *Caperton v. A. T. Massey Coal Co.,* 556 U.S. 868 (2009) is unconstitutional and thus no further proceedings may be conducted at the appellate level in any proceeding involving Sanai as attorney or counsel  in which constitutional issues of appellate justice impartiality are put into issue until such rights are acknowledged and codified by rules that meet the standards of federal due process and state due process requirements or the Defendants enter an order granting such rights to Sanai specifically to Sanai specifically in any litigation in which he is involved as party or counsel;

-4-

e.   the Defendants shall immediately order the State Bar to produce all exculpatory information (which is information that helps Sanai or hinders or is unfavorable to any asserted accusation by the State Bar against Sanai) in its files regarding any disciplinary charge it has ever brought against Sanai without objection or invocation of privilege under state law, which information shall include without limitation all the reports it published on March 10, 2023 in unredacted form, and all documents reviewed by the authors of such reports;

f.   the Defendants shall issue an order to show cause and then adjudicate on the merits every issue raised in any prior petition for review in which Sanai moved to disqualify and/or recuse a Court of Appeal Justice which denial order by the Court of Appeal or justice thereof cited *Kaufman v. Court of Appeal,* 31 Cal.3d 933 (1982);

3.   the Defendants shall order the preservation and production, and cause the preservation and production of all visual surveillance tapes of the California Supreme Court's Clerk's office, Supreme Court entrance security checkpoints and entrances (including the street and sidewalk in front of the Supreme Court's courthouse) for the period from 3:00 pm to 5:00 pm on March 24, 2023.

The grounds for this requested judgment are 42 U.S.C. §1983, Fed. R. Civ. P. 55,  and the Fourteenth Amendment. *Ex Parte* relief is authorized pursuant to Fed. R. Civ. P. 55.  Sanai requests that by July 12, 2023 this Court EITHER hold oral argument or, if none is needed, enter judgment.  This motion is based on the complaint in this action, the attached memorandum of points and authorities, the declarations filed as dockets 21-1, 22-1, 22-2, 27-1 and the declaration filed herewith, the exhibits filed as dockets 21-2 to 21-7, 22-3, 27-2, and the other records of this action.

By: _____/s/ Cyrus Sanai_____
CYRUS SANAI
Plaintiff

AMENDED EX PARTE MOTION FOR ENTRY OF DEFAULT JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 10

II.    THE STATE BAR'S CORRUPTION ...................................................................... 12

III.  THE PROCEDURAL BARS TO DISQUALIFYING CALIFORNIA TRIBUNALS ON
       CONSTITUTIONAL GROUNDS> ....................................................................... 15

IV.    PROCEDURAL HISTORY ...................................................................................... 18

V.    LEGAL STANDARD ................................................................................................ 22

   A. Overview ................................................................................................................. 23

   B. Procedural Requirements ....................................................................................... 24

   C. *Eitel* Factors ......................................................................................................... 24

       1.    Possibility of Prejudice to Plaintiff ............................................................ 24

       2.    The Merits of Plaintiff's Substantive Claim and Sufficiency of the Complaint. .............. 24

       3.    Amount at Stake ......................................................................................... 43

       4.    The Possibility of Dispute Concerning Material Facts. ............................ 43

       5.    Default is Product of Excusable Neglect ................................................... 44

       6.    The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions
             on the Merits ............................................................................................... 45

   D.   The Relief Sought .................................................................................................. 46

       1.    Relief is Addressed after the *Eitel* Factors. ............................................. 46

       2.    Declaratory Relief Should be Granted. ...................................................... 47

       2.    Injunctive Relief Should be Granted. ......................................................... 48

VI.    CONCLUSION .......................................................................................................... 52

MEMORANDUM OF POINTS AND AUTHORITIES

1

## TABLE OF AUTHORITIES

2

3

### Cases

4805 Convoy, Inc. v. City of San Diego, 183 F.3d 1108 (9th Cir. 1999) ................................. 11, 34

Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813 (1986) ................................................................ 37, 38

Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328 (11th Cir. 2005)................................ 47

Amoco Production Co. v. Gambell, 480 U.S. 531 (1987)............................................................. 50

Armstrong v. Exceptional Child Center, Inc., ___ 135 S.Ct. 1378, 1384 (2015) ........................ 49

Brillhart v. Excess Ins. Co., 316 U. S. 491 (1942) ...................................................................... 47

Campbell v. Facebook, Inc., 951 F.3d 1106 (9th Cir. 2020)................................................. 11, 34

Caperton v. A. T. Massey Coal Co., 556 U.S. 868 (2009) ..................................... 34, 36, 37, 40, 41

Carroll v. Safford, 3 How. 441, 11 L.Ed. 671 (1845) ................................................................. 49

Chamberlain v. Allstate Ins. Co., 931 F.2d 1361, 1366 (9th Cir.1991) ...................................... 48

Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039 (N.D. Cal. 2010)........................... 47

Danning v. Lavine, 572 F.2d 1386 (9th Cir.1978) ...................................................................... 25

Gacho v. Wills, 986 F.3d 1067 (7th Cir. 2021) ...................................... 15, 16, 32, 35, 37, 38

Geddes v. United Fin. Grp., 559 F.2d 557 (9th Cir. 1977) ......................................................... 23

Gibson v. Berryhill, 411 U.S. 564 (1973) ........................................................................... 25, 48

Grupo Dataflux v. Atlas Global Group, LP, 541 U.S. 567 (2004) ............................................... 10

In Re Girardi, 611 F.3d 1027 (9th Cir. 2010) ........................................................................... 27

In Re Jeff Johnson,
    Cal. Jud. Performance Comm'n, Decision Removing Jeff Johnson (June 2, 2020) ................... 42

In Re Jenkins (March 27, 2023) Cal. Sup. Ct. No. S267391...................................................... 21

In re Rose, 22 Cal. 4th 430 (2000) ........................................................................................... 50

In re Rose, 22 Cal.4th 430 (Cal. 2000)..................................................................................... 36

Jack Farenbaugh & Son v. Belmont Construction, Inc. 194 Cal. App.3d 1023 (1987).................. 16

Kaufman v. Court of Appeal, 31 Cal.3d 933 (1982)............................................. 17, 27, 34, 35, 36

Kloepping v. Fireman's Fund, 1996 WL 75314 (N.D.Cal. Feb.13, 1996).................................... 25

Knick v. Twp. of Scott, 139 S. Ct. 2162, 2167 (2019)............................................................... 48

Lew v. Moss, 797 F.2d 747 (9th Cir. 1986) .............................................................................. 10

Liteky v. United States 510 U.S. 540 (1994) ............................................................................. 16

Lujan v. Defenders of Wildlife, 504 U.S. 555, 570 n. 5, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) 10

Monterey Mech. Co. v. Wilson, 125 F.3d 702, 715 (9th Cir. 1997) ............................................ 50

Mullan v. Torrance, 22 U.S. 537, 539 (9 Wheat.), 6 L.Ed. 154 (1824) ...................................... 10

Nelson v. NASA, 530 F.3d 865, 882 (9th Cir. 2008), rev'd on other grounds,
    Nat'l Aero. & Space Admin. v. Nelson, 562 U.S. 134, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011). 51

Ohio Bureau of Empl. Servs. v. Hodory, 431 U.S. 471 (1977) ................................................... 25

Olivera v. Grace, 19 Cal.2d 570, 574-5 (1942) ........................................................................ 27

PepsiCo, Inc. v. California Security Cans, 238 F. Supp. 2d 1172 (C.D. CA 2002) .......... 44, 45, 46

Pulliam v. Allen, 466 U. S. 522 (1984) ............................................................................. 33, 49

Regents of Univ. of Cal. v. Am. Broad. Cos., Inc., 747 F.2d 511 (9th Cir. 1984)........................ 51

Roitz v. Coldwell Banker Residential Brokerage Co., 62 Cal.App.4th 716 (1998) ...................... 16

Smith v. Rockett, 522 F.3d 1080 (10th Cir. 2008)...................................................................... 10

Sosna v. Iowa, 419 U.S. 393 (1975)......................................................................................... 25

Supreme Court of Virginia v. Consumers Union of United States, Inc.,
    446 U. S. 719 (1980) ............................................................................................. 33, 49, 50

*TCI Group Life Ins. Plan v. Knoebber,* 244 F.3d 691  (9th Cir. 2001) ........................................ 44
*TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915 (9th Cir. 1987) ...................................... 23
*Trust Inv. Advisers, Inc. v. Hogsett,* 43 F.3d 290 (7th Cir. 1994) ........................................... 25
*United States v. Kojayan,* 8 F.3d 1315 (9th Cir. 1993) .................................................. 28, 29, 32
*United States v. Olsen,*  737 F.3d 625, 626 (9th Cir. 2013) ................................................... 28
*Urias v. Harris Farms, Inc.,* 234 Cal. App.3d 415 (1991) ................................................... 27
*Williams v. Davis,* 00-cv-10637-DOC (C.D. Cal. Mar. 29, 2016) ........................................ 27
*Williams v. Pennsylvania,* 136 S. Ct. 1899 (2016) ...................................................... 17, 35
*Wilton v. Seven Falls Co.,* 515 US 277, 282 (1995) .................................................... 47, 50

## Statutes

28 U.S.C. §2201 ......................................................................................................... 33, 46
42 U.S.C. §1983 ............................................................................................ 33, 46, 48, 49
Bus. & Prof. Code §10177 ................................................................................................ 35
Cal. Bus. & Prof. Code §10177 ....................................................................................... 36
Cal. Bus. & Prof. Code §6085(b) ....................................................................... 19, 33, 41
Cal. R. Civ. P. §663a ....................................................................................................... 26
Cal..Penal Code §1473 ..................................................................................................... 27

## Other Authorities

A. Graef and S. Mizelle, "Alexandria Ocasio-Cortez says justices are 'destroying the legitimacy'
    of the Supreme Court", cnn.com, July 2, 2023 at www.cnn.com/2023/07/02/politics/aoc-
    supreme-court-dangerous-cnntv/index.html ...................................................... 11, 44
B. Lowrey, "Calif. Bar Referred 7 Ex-Employees To Political Watchdog", law360.com, June 6,
    2023 ................................................................................................................... 10, 37
C. Hulse, "Harlan Crow Declines to Provide Information Sought by Senate Democrats", *New York
    Times,* May 23, 2023 ............................................................................................... 37
D. Lithwick, M.J. Stern, "The Time of Alito's Private Jet Scandal Couldn't Be More Damning,"
    *slate.com,* June 26, 2023 at slate.com/news-and-politics/2023/06/alito-private-jet-defense-
    supreme-court-hypocrisy.html ................................................................................. 44
H. Keene, "Gavin Newsom has Longstanding Ties to Dem Power Player Facing Lawsuits,
    Investigations", Fox News, June 22, 2021 at www.foxnews.com/politics/gavin-newsom-ties-
    tom-girardi-lawsuit ..................................................................................................... 13
H. Ryan, M. Hamilton, "Erika Jayne Under Fire After Alleging Judge's Involvement with Tom
    Girardi"  *Los Angeles Times,* December 22, 2020 ..................................................... 13
K. Ofgang, "Howard Miller Poised to Became State Bar President", *Metropolitan News-
    Enterprise,* May 4, 2009 ..................................................................................... 12, 15
K. Reich, "Judges' Role in Cruise Sponsored by Lawyer's Group Raises Questions", Los Angeles
    Times, October 6, 1997 at www.latimes.com/archives/la-xpm-1997-oct-06-me-39832-
    story.html .................................................................................................... 13, 36, 37

## Rules

Cal. Rules Prof. Cond. 3.4(b) .......................................................................................... 32
Cal. Rules Prof. Cond. 5-220 .......................................................................................... 32
Fed. R. Civ. P. 54(c) ........................................................................................................ 23
Fed. R. Civ. P. 55 ............................................................................................................. 24
Fed. R. Civ. P. 60(b) ........................................................................................................ 26
Fed. R. of Civ. Proc. 55(b)(2) ......................................................................................... 22
Rules Proc. of State Bar, rule 5.46(A) ............................................................................. 16

MEMORANDUM OF POINTS AND AUTHORITIES

Rules Proc. of State Bar, rule 5.46(C) ........................................................................ 16
Rules Proc. of State Bar, rule 56(C) .......................................................................... 17

MEMORANDUM OF POINTS AND AUTHORITIES

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3

## I.    INTRODUCTION

4      This is a pre-judgment challenge to attorney discipline meted upon Plaintiff Cyrus Sanai

5  pursuant to the longest trial ever to occur in the world, over six years.

6      On June 5, 2023 Plaintiff Cyrus Sanai filed an ex parte motion for entry of default judgment,

7  requesting oral argument or a hearing by June 6, 2023 if possible, and in any event relief by June

8  30, 2023.  Docket No. 21.  Sanai was concerned that the tsunami of motions that were transferred

9  to the Court, plus the Court's notified absence at the last week of June and first week of July,

10  would result in delay in processing this motion.  The Court took no action, so it appears Sanai's

11  fears were borne out.  As the clock ticked, Sanai filed supplemental motions and errata.  *See*

12  Docket Nos. 22-30.

13      Sanai is now faced with having to file a motion for a preliminary declaratory judgment, a

14  remedy that some courts have employed but at least one finds does not exist, and if it does not, a

15  temporary restraining order and preliminary injunction until the Court enters judgment.

16      While preparing the document, it became clear that the motion for entry of default and the

17  proposed order had to be amended, because the disciplinary proceedings are finished and

18  discipline is ongoing.  This does not affect the jurisdiction of this Court because "[i]t has long been

19  the case that the jurisdiction of the court depends upon the state of things at the time of the action

20  brought*." Grupo Dataflux v. Atlas Global Group, LP,* 541 U.S. 567, 570 (2004). *Lew v. Moss,* 797

21  F.2d 747, 750 (9th Cir. 1986); *Smith v. Rockett,* 522 F.3d 1080, 1081 (10th Cir. 2008) ("Standing

22  is assessed as of the time the action was commenced." (*citing Lujan v. Defenders of Wildlife,* 504

23  U.S. 555, 570 n. 5, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Mullan v. Torrance,* 22 U.S. 537, 539

24  (9 Wheat.), 6 L.Ed. 154 (1824) ("[T]he jurisdiction of the court depends upon the state of things at

25  the time of the action brought....").

26       It is firmly established that standing also arises from continuing adverse effects of past

27  misconduct, provided that injunctive relief can terminate such effects if granted at the time the

28  complaint was filed.  The standard for standing for injunctive or declaratory relief in the Ninth

Circuit and indeed under United States Supreme Court law is well established:

> To have standing to seek to enjoin Facebook's private message practices, Plaintiffs must show "either 'continuing, present adverse effects' due to [their] exposure to [Facebook's] past illegal conduct or 'a sufficient likelihood that [they] will again be wronged in a similar way.' " *Villa v. Maricopa County* , 865 F.3d 1224, 1229 (9th Cir. 2017) (*first quoting O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ; *then quoting City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ).

*Campbell v. Facebook, Inc.,* 951 F.3d 1106, 1119-20 (9th Cir. 2020).

Suspension of a license constitutes continuing, present adverse effects:

> [T]here is no question that Convoy can satisfy the "injury-in-fact" requirement with regard to the revocation and suspension procedures employed by the City in suspending Convoy's license. *See Desert Outdoor Advertising, Inc. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir. 1996) ("[A]ppellants suffered an injury in fact because the City actually brought an enforcement action against [them]."). Convoy therefore has standing to maintain a facial challenge to the lack of procedural safeguards associated with those procedures. *See Baby Tam,* 154 F.3d at 1100.

*4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108, 1113 (9th Cir. 1999)

Further, in considering amendments to the relief requested it became clear that the Defendants' non-appearance in this action is most likely intentional and in fact a very smart litigation strategy. As discussed in more detail below, because *Younger* abstention does not apply to this action at this time (for, among other reasons, the Supreme Court imposing a procedural bar on presenting constitutional arguments regarding attorney discipline matters the day after the petition for rehearing deadline falls), appearance in this case will require the Defendants to litigate the merits, which include their relationship to Thomas Girardi. Girardi is legendary for the excessive parties, dinners, and trips upon which he showered the judiciary. See, e.g., Exh. GG Vol III Docket No. 21-4. The provision of undisclosed hospitality to State Bar Court judges and officials, including the first State Bar Court judge to rule in Sanai's underlying case, is already the subject of administrative and criminal referrals. B. Lowrey, "Calif. Bar Referred 7 Ex-Employees To Political Watchdog", law360.com, June 6, 2023; Exh. EEEEE. It would be folly for the Defendants to become active litigants in a lawsuit that cannot be swatted away with *Younger* abstention in a political environment in which the acceptance of largesse by United States Supreme Court Justices Alito and Thomas is an attack point for Democratic politicians. *See, e.g.,* A. Graef

and S. Mizelle, "Alexandria Ocasio-Cortez says justices are 'destroying the legitimacy' of the Supreme Court", cnn.com, July 2, 2023 at www.cnn.com/2023/07/02/politics/aoc-supreme-court-dangerous-cnntv/index.html.  A default judgment in this case will not create issue preclusion in any other litigation and the failure to respond may be blamed on subordinates.  To help ensure that the Defendants are not motivated to seek relief from default, Sanai also amended the motion and relief requested to restrict the benefits of the relief to Sanai.  In so doing, he is incorporating the additional pleading and errata previously filed with this Court.  Upon this Court granting leave to file this overlong document, it will supersede and replace the motions, briefs, declarations and errata previously filed that were withdrawn; the Exhibits are not being refiled, however.

Exhibits A-DDDD, Vol I-V were filed as Docket Nos. 21-2 to 21-6.  Volumes I-V constitute State Bar documents and press reports regarding the corruption in the State Bar and related matters.  Docket 21-7 are Volumes VI, numbered 1-9 documents from the underlying State Bar and California State Bar proceedings and the updated version of a docket.  Additional Exhibits are Exhibit EEEEE, Vol. VII Docket No. 22-3, a referral letter from the State Bar to the Fair Political Practices Commission, and Exhibit 11, Docket No. 27-2, which is a letter from the Defendants' Chief Clerk explaining the procedural bar imposed by the Defendants on making constitutional or other arguments to the Defendants from and after March 30, 2023.

## II.    THE STATE BAR'S CORRUPTION

For two decades the State Bar of California was corrupted by a group of lawyers, investigators and others centered around Thomas Girardi ("Girardi").  Docket No. 1, Complaint at 4.  Once a prince of the legal profession, a friend and lover of judges, and a political and legal power-broker, Girardi is now committed into a home for Alzheimer's patients and under indictment while the State Bar desperately tries to distract attention from its corruption and involvement with Girardi.  Two years ago the *Los Angeles Times* began a series of exposés which demonstrated that the Office of Chief Trial Counsel ("OCTC"), State Bar Board of Trustees, and the State Bar Court had been corrupted by Girardi.  Docket 1, Complaint at 4-5.  As set out in the articles and additional filings made in the California Supreme Court, Girardi over two decades had successfully placed

operatives and allies in the State Bar Board of Trustee (including at least one past President of the State Bar), the State Bar's management (including a State Bar Executive Director who was fired by the State Bar for misconduct but still practices law while his bar disciplinary proceedings remain on hold), all of the prior Chief Trial Counsels with one partial exception, numerous State Bar investigators and lawyers (many who worked for Girardi while at the State Bar), and past and currently serving State Bar Court judges. *See generally* Exhibits Volumes I-V Docket Nos. 21-2 to 21-6.

In 2009, Girardi cemented his control over the State Bar when his "partner" Howard Miller became State Bar President by default when all other eligible candidates mysteriously refused to run. *See* K. Ofgang, "Howard Miller Poised to Became State Bar President", *Metropolitan News-Enterprise* at 1, May 4, 2009. Under Girardi's control, the State Bar, including its Board of Trustees, Executive Directors, Chief Trial Counsels, and judges, sought to eliminate the ability of the persons it was permitted or encouraged to prosecute by Girardi and his allies (who included a large network of lawyers and corrupted California state court judges) by making defense of their cases nearly impossible. Thus if you were Girardi, a colleague of Girardi's, or a friend of one of Girardi's judicial allies, you virtually had a free pass for misconduct. However, if you were outside this magic circle, the State Bar would prosecute you with all important due process protections removed; and if one was before a Girardi-allied State Bar Court judge, all discretionary procedural and discovery rulings would go against that respondent. *See* Docket 1 Complaint at 6 ¶6; Exhs. A-C Vol. I at 1 to 155 Docket No. 21-2; Exh. HH Vol. III Docket No. 21-2 at 658 (*quoting* the California Legislature's former monitor over the State Bar University of San Diego School of Law professor Robert Fellmeth that "bar employees "tend not to go after anyone, not just Girardi, who has a long-standing reputation, lots of friends, and resources to battle the crap out of them.""").

The State Bar does not deny that its prosecutorial and adjudicative policies resulted in forgoing disciplinary actions against Girardi and his Cabal. See Exh. A-C, Vol. I, Docket No. 21-2. Indeed, one of its internal reviewers, engaged by the State Bar to advise on its policies, found that there are *fifty* Girardis which State Bar has refused to prosecute. *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES

While the corruption of a series of Bar Chief Trial Counsels has been explored in a series of articles in the *Los Angeles Times*, Girardi's influence in the judiciary has not received the same scrutiny. Girardi was the undisputed king-maker for persons seeking to be appointed to the California state judiciary. Girardi assisted in moving appointments forward for state and federal judges, and State Bar Court judges, as well as forging strong personal relationships with many. Docket 1, Complaint at 4-5; see also Exh. UU Vol. III at 789-805, Docket No. 21-4 (discussing how Girardi "poured millions into local, state and national races personally and lined up additional donations from his wife, "Real Housewives of Beverly Hills" star Erika; the employees of his law firm; and the multitude of California trial lawyers who did business with him — or hoped to") ; H. Keene, "Gavin Newsom has Longstanding Ties to Dem Power Player Facing Lawsuits, Investigations", Fox News, June 22, 2021 at www.foxnews.com/politics/gavin-newsom-ties-tom-girardi-lawsuit. Girardi had close personal relationships with certain judges; so, for example and without limitation, in the case of former Central District of California Judge Tevrizian, he was a life-long friend; in the case of California Court of Appeal Justice Tricia Bigelow, he was her lover; and in the case of former LA Superior Court Judge Daniel J. Buckley, he was Buckley's legal idol. *See* K. Reich, "Judges' Role in Cruise Sponsored by Lawyer's Group Raises Questions", Los Angeles Times, October 6, 1997 at www.latimes.com/archives/la-xpm-1997-oct-06-me-39832-story.html; H. Ryan, M. Hamilton, "Erika Jayne Under Fire After Alleging Judge's Involvement with Tom Girardi" *Los Angeles Times,* December 22, 2020; J. Kloczko, "Dating Tom: My Lunch dates with Famous Lawyer Guy Tom Girardi," *The Debaser*, May 9, 2021 at debaser.substack.com/p/lunch-with-tom?s=r ("Tom looked across the room and saw Daniel Buckley, who was the assistant presiding judge of Los Angeles County Superior Court. What happened next was amazing. He pointed at the judge, wagged his finger "come here," and the judge ran up to Girardi like a groupie. I was introduced to him, and a few weeks later we had lunch. Tom hooked it up."); Exh. VV Vol. IV Docket No. 21-5 at 806-819 (discussing Second Appellate District Judge Tricia Bigelow's adulterous affair with Girardi and the gifts and apparent bribes paid to her with stolen money from his clients).

Girardi obtained this power through money stolen from his clients, which he liberally

contributed to Democratic politicians such as former Governor Jerry Brown and current Governor Gavin Newsom as well as all of the rising stars at the state and local levels.  Docket 1, Complaint at 5-6.  As a result, Brown and Newsom regularly appointed his hand-picked candidates, who were often informed of their appointments at dinners at Girardi's home attended by the governors. *Id.* Defendants Groban and Jenkins were charged with accepting and evaluating Girardi's favored candidates, and were instrumental in Girardi's retention of power within California's legal system due to their genuflecting towards Girardi's candidate choices.  *Id.*  Even those appointees to state judicial positions who were not selected by Girardi had to obtain his approval to advance.  *Id.* All of the Defendants except Justice Guerrero were vetted by Girardi; Justices Kruger, Groban and Jenkins were Girardi's first choice for the positions; in the cases of Groban and Jenkins, due to their close personal and professional relationships with Girardi.  *Id.*

## III.  THE PROCEDURAL BARS TO DISQUALIFYING CALIFORNIA TRIBUNALS ON CONSTITUTIONAL GROUNDS>

While Girardi was corrupting the State Bar, the Chief Trial Counsels, all of whom were under his control from 2009 until the collapse of his firm, and the approximately fifty percent of the State Bar Court judges who were influenced by him, were consistently more harsh and aggressive towards defendants who were not Girardi or under his protection.  Docket 1 Complaint at 6; *Bracy v. Gramley,* 520 U.S. 899 (1997).  In *Bracy,* the United States Supreme Court held that where such corruption has been established as likely, a party is entitled to discovery to determine the scope and effect of such corruption on the adjudication of the party's case before the corrupt tribunal.  In *Gacho v. Wills,* 986 F.3d 1067 (7th Cir. 2021), one of the many cases involving persons victimized by the corrupt judge in *Bracy*, the Seventh Circuit held that a party need not demonstrate *actual* bias (though such demonstration is sufficient), but instead may demonstrate an *unconstitutional risk* of bias, which is almost always met when the judicial branch has been corrupted.  The State Bar, including its prosecutors, are part of the judicial branch.  Docket No. 1 Complaint at 6.  However, State Bar prosecutors are also bound by the same ethical requirements

as criminal prosecutors, though they generally refuse to recognize this or abide by the restrictions. *See* Exh. C Vol. I Docket No. 21-2 at 71.

California law neither recognizes *Bracy* and *Gacho* claims against members of the judicial branch, nor will it allow evidence necessary to show a *Bracy* and *Gacho* violation.  That is because California case law does not permit a party to enter a trial court's rulings or in-court statements as evidence to prove bias under either state or federal law.  *See Roitz v. Coldwell Banker Residential Brokerage Co.,* 62 Cal.App.4th 716, 724 (1998); *Jack Farenbaugh & Son v. Belmont Construction, Inc.* 194 Cal. App.3d 1023, 1031 (1987); *People v. Guerra,* 37 Cal.4th 1067, 1112 (2006).  In *Guerra,* the California Supreme Court rejected judicial bias claims made under state and federal law, stating that "Defendant has a due process right to an impartial trial judge under the state and federal Constitutions….a trial court's numerous rulings against a party— even when erroneous—do not establish a charge of judicial bias".  *Id.*  To establish a claim of absence of impartiality under *Bracy* and *Gacho,* a litigant must do **exactly** what *Guerra* prohibits, pointing to the adverse rulings as evidence, along with corruption by third parties.  Federal law is the opposite of California, and a judge's rulings and statements in courts are admissible to show bias, even without other evidence.  *Liteky v. United States* 510 U.S. 540, 551 (1994).  In *Liteky* the United States Supreme Court recognized that the statements and orders of a judge could, on their own, provide a proper basis for recusal:

> It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that "extrajudicial source" is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one, since it is not the exclusive reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. (That explains what some courts have called the "pervasive bias" exception to the "extrajudicial source" doctrine. *See, e. g., Davis v. Board of School Comm'rs of Mobile County,* 517 F.2d 1044, 1051 (CA5 1975), *cert. denied,* 425 U. S. 944 (1976).)

*Id.*

But there is another facial barrier to raising *Bracy* or indeed any constitutional claims regarding State Bar Court judge bias or lack of impartiality in the State Bar Court.  The State Bar

-16-

MEMORANDUM OF POINTS AND AUTHORITIES

Court Rules of Procedure do not allow it.  Rules Proc. of State Bar, rule 5.46(C). The State Bar

Court Rules of Procedure only allow disqualification of State Bar Court judges to be made under

specific portions of the California statutory grounds for disqualification:

> Only the provisions of Code of Civil Procedure §§ 170.1, 170.2, 170.3(b), 170.4,
> and 170.5(b)–(g) apply to judicial disqualification in State Bar Court proceedings.

Rules Proc. of State Bar, rule 56(C).

Accordingly, when it comes to disqualification of State Bar Court judges under authority

emerging solely from federal law, the State Bar Court Rules of Procedure explicitly prohibit

raising federal claims.  This means that state bar recusal requests can never be perfected for

consideration by the California Supreme Court.  Indeed, this was the case here.  Sanai issued a

subpoena to depose Judge Valenzuela, which she quashed.  Docket No. 1 Complaint at 14.

A similar problem exists at the California Supreme Court.  There is no procedure to disqualify

or seek the recusal of a Court of Appeal justice or California Supreme Court justice.  *Kaufman v.

Court of Appeal,* 31 Cal.3d 933 (1982).  This holding is recognized by the Ninth Circuit.  *Hirsh

v. Justices of Supreme Court of California,* 67 F.3d 708 (9th Cir.1995) (acknowledging the

"absence of a mandatory statutory recusal mechanism applicable to justices of the California

Supreme Court").  The standard for review is to demonstrate actual, prejudicial bias, which is not

the federal standard.  *Compare Kaufman, supra* at 940 ("in this court the sole question would be:

"Because of his bias, did the appellate proceeding wherein a justice participated become illegally

and prejudicially unfair?") *with Williams v. Pennsylvania,* 136 S. Ct. 1899, 1905-1909 (2016)  (in

applying federal standard, "Court asks not whether a judge harbors an actual, subjective bias, but

instead whether, as an objective matter, "the average judge in his position is `likely' to be neutral,

or whether there is an unconstitutional `potential for bias'" and "a due process violation arising

from the participation of an interested judge is a defect "not amenable" to harmless-error

review").   Thus under the federal standard there is no requirement to show the prejudice required

under *Kaufman, supra.  See also Gacho*, *supra*, at 1075, *citing Edwards v. Balisok*, 520 U.S. 641,

647 (1997).   It is therefore impossible to move to disqualify a California Court of Appeal judge

or justice under the federal standard—there is no procedure to do it, and the standard applied is

not the federal standard.  Nor is there any mechanism to obtain disclosures of potential conflict of

interests, or to conduct discovery against them to determine whether a conflict of interest exists.

## IV.    PROCEDURAL HISTORY

Plaintiff Sanai was the subject of an out-of-control prosecution, in which eight of the nine

charges were dismissed when the Defendants rested in 2015, several due to misconduct by

prosecutors for the OCTC.   *See* Exh. 3, Sub Exhs.  A-B Vol. VI at 1405-1429.    In two different

orders of dismissal, the State Bar Court Hearing Department Judge, Donald Miles, found that for

some of the charges covered by the State Bar's notice of disciplinary charges ("NDC"), *Sanai v.*

*Saltz,* the **trial court judge and opposing counsel conspired to suborn the**

**testimony** of a Los Angeles County Superior Court clerk, who recanted her prior testimony in

*Sanai v. Saltz* when subpoenaed to appear before the State Bar Hearing Department:

> a contention by Respondent's opposing counsel in 2006 that Respondent,
> after the Memorandum of Costs had been filed, had made a notation on the
> previously-filed service list regarding the identity of the designated agents of
> those corporate defendants for service of process. However, it is undisputed that
> this notation was made by Respondent with the knowledge and consent of the
> court's clerk, in her presence, and at her request. This clerk was aware that
> Respondent, a party to the action, was not (and could not be) the person who had
> signed the proof of service under penalty of perjury, and there is no evidence that
> Respondent was claiming to modify the proof of service or that the clerk believed
> that Respondent's subsequent notation in any way modified the original proof of
> service.
>     The disputed issue at that time was whether the clerk had merely requested
> that Respondent write down the identity of the designated agents for service of
> process or whether she had asked Respondent to write down the names of the
> individuals who had actually been served. At an ex parte hearing on May 11,
> 2006, this clerk was called to testify regarding that issue. Prior to her being
> summoned to testify in 2006, comments by both the presiding judge and opposing
> counsel made clear that each had discussed with her the substance of her
> anticipated testimony. (Ex. 29, pp. 5-6; cf. p. 11, line 26.  During her testimony,
> her answers were equivocal, including acknowledging on cross-examination that
> her memory of the event (which had happened less than three days before) was
> poor and that she did not remember exactly the reason she had given Respondent
> for asking him to write down the names of the designated agents for service of
> process. (Ex. 29, pp. 25-26, 44.)

Exh. 3 Sub-Exh. A Docket No. 21-7 at 1412 (February 6, 2015 Order at 7); *see also* Docket 1,

Complaint at 12.

1    However, Judge Miles, notwithstanding his finding of misconduct in the Superior Court,

2    elected to stay the case rather than allow Sanai to put on his defense case.  *Id.*

3    Also at issue before Judge Miles were exculpatory documents that the State Bar refused to

4    produce from its investigatory records.   The status of a Fourteenth Amendment right to

5    exculpatory evidence from the State Bar was admitted by Judge Miles.  *See* Exh. 3, Sub-Exh. B,

6    Vol. VI, Docket No.  21-7 at 1419.  Such a right also exists in California Business and

7    Professions Code §6085(b), which states that Sanai had the right "[t]o receive **any and all**

8    **exculpatory evidence** from the State Bar after the initiation of a disciplinary proceeding in State

9    Bar Court, and thereafter when this evidence is discovered and available."  Cal. Bus. & Prof.

10   Code §6085(b) (bold emphasis added).

11   In the context of *Brady* disclosures, evidence is exculpatory if it is favorable to the accused.

12   "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution…".  *In re*

13   *Sassounian,* 9 Cal.4th 535, 544 (1995).  If the evidence is favorable and could change a verdict

14   against the defendant or respondent in his favor, then the exculpatory evidence is "material."

15   This right is to receive exculpatory evidence from *all* parts of the State Bar, not just the Chief

16   Trial Counsel. Thus the State Bar Court, Executive Director, General Counsel, and Board of

17   Trustees must also provide such information.  This obligation is not subject to any exceptions

18   other than mitigating evidence need not be disclosed, so California law privileges do not apply.

19   After repeated refusals, Judge Miles imposed evidence and issue sanctions on the State Bar, as it

20   is the State Bar Court's position that it lacks the authority to impose anything other than mere

21   discovery sanctions where the State Bar violates its duty of disclosure.  Docket 1, Complaint at

22   12.

23   While the stay was ongoing, Judge Miles was replaced by a different State Bar Court judge,

24   Cynthia Valenzuela.  Docket 1 Complaint at 12.   Though Sanai did not know it at the time, both

25   Judge Miles and Judge Valenzuela had obtained their positions through Girardi and were part of

26   his Cabal.  Docket 1 Complaint at 12-13; *see also* Exh. 3 Vol. 1 at 78, 114-115.  Indeed, when

27   Girardi was finally prosecuted by the State Bar, Valenzuela recused herself from the case while

28   refusing to disclose why when asked by Sanai, pre-emptively ruling that she had no "conflict of

MEMORANDUM OF POINTS AND AUTHORITIES

interest" under California law.  Docket 1 Complaint at 13-4.  Sanai took this issue up on interlocutory appeal to the California Supreme Court; the Court denied review.  *See* Exh. 2 Vol. VI Docket No. 21-7 at 1362-81; Exh. 5 Vol. VI at 1484-1485.   No justices recused themselves, even though at least two of them, Justice Kruger and Justice Groban, have conflicts of interest that required recusal due to their relationship with Girardi.  Docket 1 Complaint at 14.

Valenzuela quashed all witness subpoenas.  Docket 1, Complaint at 13-14.  Unable to put on additional evidence, Sanai did the best he could, and Valenzuela imposed a two-month suspension.  Docket 1, Complaint at 14.  In doing so, she made clear that she rejected the findings of fact exonerating Sanai made by Judge Miles, and she increased the recommended discipline and stated she would have recommended Sanai be disbarred if she could have.  *See* Exh. 7 Vol. VI, Docket No. 21-7 at 1515 (rejecting Judge Miles findings that trial court and opposing counsel prepared witness in advance concerning testimony she recanted). This was a manifest instance where under *Bracy,* Sanai was entitled to argue that the State Bar's corrupt relationship with the Girardi Cabal provided a basis for discovery against her.  However, to demonstrate *Bracy* and *Gacho* absence of impartiality in this case as to the second State Bar Court judge in this matter, Cynthia Valenzuela, Sanai would have to introduce as evidence the portions of her rulings where she makes clear that, contrary to Judge Miles' findings and on matters not under review, she found a pattern of misconduct in the matters presented to the State Bar Court where Sanai was ACQUITTED of all but one charge.  Exh. 7 Vol. VI Docket No. 21-7 at 1515, 1521.  In addition, Valenzuela completely rejected the obvious conclusion that the State Bar prosecutors had committed misconduct by filing causes of action they knew they would lose, violating discovery orders, and failing to turn over exculpatory information.  Exh. 7 Vol. VI Docket No. 21-7 at 1520.  Perhaps most revealing, Valenzuela castigated Sanai for seeking to prove the existence of an illegal judicial conspiracy when her State Bar judicial employer was enmeshed in a twenty year corrupt conspiracy between Girardi and members of the State Bar Court, State Bar Administrators, OCTC and Board of Trustees.  *Id.*  Valenzuela was actually biased against Sanai.

On appeal to the Review Department of the State Bar Court, the Court dismissed Sanai's appeal on the grounds that he failed to file it after a clerk's default notice was issued, but no such

notice was issued or could have been issued under the State Bar Court Rules of Procedure.
Docket 1, Complaint at 16.

Sanai filed a timely petition for review on November 1, 2022 with the California Supreme
Court that reserved all federal constitutional issues.  Exh. 8 Vol. 6 at 1530 Docket 21-7. From the
time the Complaint, Docket No. 1 was filed to the present moment, the status of the litigation
before the California Supreme Court advanced then terminated.  At the time of filing the
Complaint in this action on March 9, 2023, the Supreme Court had made no decision on Sanai's
Petition for Review.  The next day the State Bar issued a press release and three heavily redacted
internal reports admitting to decades of corruption associated with Girardi, a judicial gatekeeper
and one of the most famous attorneys in the United States thanks to his appearances on "Real
Housewives of Beverly Hills."  *See* Exhs. A-C, Vol I. Docket No. 21-2 at 1-159.  The State Bar's
outside counsel confirmed that the State Bar prosecutors were unaware of (or chose to ignore)
their ethical duties, which are the same as criminal prosecutors.  Exh. C Vol I, Docket No. 21-2 at
71-2.

Two weeks later the California Court issued an opinion, *In Re Jenkins* (March 27, 2023) Cal.
Sup. Ct. No. S267391.  In *Jenkins,* the Court agreed that the due process clause of the Fourteenth
Amendment requires the state to provide exculpatory evidence at **every** stage of litigation and
even in post-judgment collateral proceedings.  In *Jenkins,* the Court interpreted federal and
California law to state that prosecutors have an ethical duty after trial and even post-conviction
proceedings to disclosure exculpatory information.  The Court noted that this duty is an attorney
ethical duty existing even in the absence of specific rules governing prosecutor duties in
California.  *See Jenkins, slip. op.* at 29-30.

In addition, as part of his representation of a third party, Peyman Roshan, Sanai had filed a
California administrative subpoena on the Court to obtain Mr. Roshan's disciplinary file with the
Court in order to defend against a reciprocal discipline matter with the Department of Real Estate.
Docket 1 Complaint at 17.

While proceedings were ongoing before the California Supreme Court, Plaintiff filed this
action.  The California Supreme Court, despite personal service on its Clerk's office and follow-

MEMORANDUM OF POINTS AND AUTHORITIES

up first class mail service, did not respond.  *See* Docket 17-1 C. Sanai Decl., Docket 17-2 Roshan Dec., Docket 17-3 M. Sanai Decl.  Default was entered by the Clerk.  Docket 18.

Six days after this lawsuit was filed, on March 15, 2021 Sanai's Petition for Review was denied.  He filed a timely petition for rehearing.   On April 3, 2023, after the filing of a petition for rehearing, the finality of the denial of the petition and imposition of a 60 day suspension was stayed pending resolution of the petition.  Exh. 8 Vol. VI Docket 21-7 at 1530-2 .

On May 31, 2023 the petition was denied, and discipline was ordered to be effective on June 30, 2023.  Exh. 8 Vol. VI Docket 21-7at 1532 .  Sanai filed his *ex parte* motion for entry of judgment in this action on June 5, 2023.  Docket No. 21.  In the motion Sanai requested that this Court order oral argument or rule by June 9, 2023 for three reasons.  The first was the Court's jammed schedule starting the following week.  The second reason was the need for speed in order to ensure that video evidence of physical service of summons and complaint on the clerk of the California Supreme Court was not lost.  The third was that the State Bar had jumped the gun and wrongfully informed the world that Sanai was suspended as of April 14, 2023, leading the Ninth Circuit to call off oral argument on his client's case, *Roshan v. Lawrence*, a lawsuit attacking the State Bar disciplinary process on different grounds than in this lawsuit. Exhs. 9-10 Vol. 6 at 1533-7 Docket 21-7.

This Court did not rule on the accelerated basis requested by Sanai.  Sanai then filed with the California Supreme Court a petition for rehearing of the order denying the petition for hearing based on the new facts regarding the State Bar's patently false public announcement that Sanai was suspended.  *See*  Exh. 11, Docket No. 27-2.  The Supreme Court responded with a letter rejecting the petition.  The letter stated that:

> The court is unable to file your submission as there is no provision in the
> Rules of Court to file a rehearing of the denial of a rehearing. This case is
> now closed and cannot be reconsidered or reinstated.

Exh. 11, Docket No. 27-2.

## V.    LEGAL STANDARD

### A.    Overview

Federal Rules of Civil Procedure Rule 55(b)(2) provides for entry of default judgment by the Court.  There are no local rules governing the content of the application; however, Plaintiff has followed the local rules of the Central District as a starting point.  Sanai's first motion for entry of default, Docket No. 21, was accompanied by a declaration of Cyrus Sanai with exhibits.

While the motion for entry of default was pending, Sanai filed notices of errata, and motions for leave to file supplemental briefs.  Docket No. 22-30.  With the exception of the exhibits, these subsequent filings are superseded by this amended motion for entry of default.

Upon entry of default, the well-pleaded factual allegations of a complaint are deemed true; however, allegations pertaining to the amount of damages must be proven. *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir. 1987); *see also Geddes v. United Fin. Grp.,* 559 F.2d 557, 560 (9th Cir. 1977) ("[U]pon default[,] the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").  In this case, Sanai is requesting no damages and is waiving, for this default judgment only, any request for costs or attorneys fees.

In *Eitel v. McCool,* 782 F.2d 1470 (9th Cir. 1986), the Ninth Circuit set forth the following non-exclusive factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel,* 782 F.2d at 1471–72 (the "*Eitel* Factors").

Rule 54(c) requires that "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). The Complaint does not request damages.  As this Court will see, the relief requested in this amended motion hews very close to that in the original complaint and is the same in kind; the primary differences is that it restricts all injunctive relief for Sanai's benefit only as compared to what was pled.  With the exception of the evidence preservation and production injunction, the requested relief in the original complaint and herein both request declaratory relief

1   as to alleged due process defects in California's handling of State Bar proceedings and all

2   proceedings when it comes to judicial bias and corruption.

3

4   **B. Procedural Requirements**

5   Sanai has satisfied the requirements for entry of default judgment. Pursuant to Rule 55,

6   Plaintiff did not petition for entry of default judgment until after default was entered against

7   Defendants by the Clerk of Court.

8   **C. *Eitel* Factors**

9   **1.    Possibility of Prejudice to Plaintiff**

10  Plaintiff is suffering professional injury from the 60 day suspension which technically took

11  effect on June 30, 2023.  *See* Exh. 8 Vol VI at 1532.  Before that suspension occurred, Plaintiff

12  was required to inform clients and terminate his representation of all of them.  He has not yet had

13  to terminate relationships in federal court because of the reciprocal discipline provisions.  In

14  addition, the State Bar decided to falsely inform the world that Plaintiff was suspended from

15  practice of law months in advance of the June 30th date, thus seeking to expand the temporal

16  effect of the injury without any legal justification.  *See* Exh. 9 Vol. VI at 1534. It is therefore

17  **indisputable** that Sanai is prejudiced absent a default judgment or interim relief entered as

18  soon as possible.

19

20  **2.    The Merits of Plaintiff's Substantive Claim and Sufficiency of the Complaint.**

21

22  **a.    The *Eitel* Factors.**

23  The second and third *Eitel* factors are usually considered together and are (1) the merits of

24  Plaintiff's substantive claim, and (2) the sufficiency of the complaint. *Eitel,* 782 F.2d at 1471-72.

25  The Ninth Circuit has suggested that these two factors require that a plaintiff "state a claim on

26  which the [plaintiff] may recover." *Kloepping v. Fireman's Fund,* 1996 WL 75314 (N.D.Cal.

27  Feb.13, 1996) (*citing Danning v. Lavine,* 572 F.2d 1386, 1388 (9th Cir.1978)).

28

-24-

b.    Affirmative Defenses are Waived and *Younger* Abstention Otherwise Does Not Apply.

What the Court does not consider under *Eitel* are affirmative defenses.  The usual barrier for federal courts to overlook and evaluate attorney disciplinary proceedings is *Younger* abstention.  *Hirsch, supra. Younger* is an affirmative defense and can be waived.  *Sosna v. Iowa,* 419 U.S. 393, 396-97 n.3 (1975); *Ohio Bureau of Empl. Servs. v. Hodory,* 431 U.S. 471, 479-80 (1977).  Failure to respond to the summons and complaint is a waiver.  In addition, under the allegations made by Plaintiff, *Younger* does not apply because of the bias exception and because of the imposition of a procedural bar that prohibits making constitutional arguments to the California Supreme Court. Complaint Docket No. 1.

Plaintiff's complaint already explains how *Younger* abstention does not apply because of "exceptional circumstances".  The first exceptional circumstances is the actual bias of the State Bar Court Judge Valenzuela against Sanai.  Complaint Docket NO. 1 at 20-1 (Valenzuela "is in actuality biased against Sanai and any victim of judge/opposing counsel (unless the victim was Girardi and his cabal))"  Where the tribunal is disqualified under the federal standard, *Younger* abstention cannot apply, even if appellate review is available.  *Gibson v. Berryhill,* 411 U.S. 564, 577 (1973); *Trust Inv. Advisers, Inc. v. Hogsett,* 43 F.3d 290, 296-7 (7th Cir. 1994) (it is reversible error to find that *Gibson v. Berryhill* exception does not apply due to availability of appellate review).

The second exceptional circumstance is the constitutional bias of three of the Defendants due to their financial interest in ensuring that further inquiry in the connections between disgraced lawyer Girardi and the California judiciary and judicial appointments process is quashed.  *See* Complaint Docket No. 1 at 8:8-21.  As Sanai seeks and sought precisely that, *Younger* does not apply.  Here, there is no appellate review available under California law—indeed, there is no procedural mechanism for seeking to disqualify appellate justices under the federal standard.

The California Supreme Court's letter decision of June 16, 2023 demonstrates that *Younger* does not apply to this case at all.  See Exh. 11.  One of the requirements for the application of *Younger* abstention is that there is no procedural bar to the presentation of constitutional arguments

to the state court which makes decisions in the case:

> "Absent `extraordinary circumstances,' abstention in favor of state judicial
> proceedings is required if the state proceedings (1) are ongoing, (2) implicate
> important state interests, and (3) **provide the plaintiff an adequate opportunity
> to litigate federal claims**."
>
> ….
>
> Appellants contend their opportunity for judicial review is inadequate because
> it is wholly discretionary. Judicial review is inadequate only when state
> procedural law bars presentation of the federal claims. *See Partington*, 880 F.2d at
> 123; *accord Moore v. Sims*, 442 U.S. 415, 430 & n. 12, 99 S.Ct. 2371, 2381 n. 12,
> 60 L.Ed.2d 994 (1979) (finding abstention appropriate because state law did not
> impose procedural barriers to raising constitutional claims). The fact that review
> is discretionary does not bar presentation of appellants' federal claims —
> appellants can raise the claims in a petition for review. *See Beltran*, 871 F.2d at
> 781, 783 (opportunity to present federal claims in a petition for writ of review is
> sufficient to trigger *Younger* abstention, even though the court of appeal simply
> "denied the petition without elaboration"); *Martori Bros. Distribs. v. James-
> Massengale,* 781 F.2d 1349, 1352, 1354 (9th Cir.), *amended on other grounds,*
> 791 F.2d 799 (9th Cir.1986) (opportunity to raise federal claims in petition for
> review satisfied the requirements of *Younger* even though a reviewing court could
> deny the petition summarily); *Fresh Int'l Corp. v. ALRB,* 805 F.2d 1353, 1362
> (9th Cir.1986) (finding abstention applicable because plaintiff "could have
> presented [its federal claim] to the court of appeal in its petition for review").

*Hirsh v. Justices of Supreme Court of California,* 67 F.3d 708, 712-13 (9th Cir. 1995)
(bold emphasis added).

Sanai could not raise any constitutional argument based on the confessions by the State Bar in

his petition for review, because his petition was filed on November 1, 2022 and the State Bar

published its confessions on March 10, 2023.  *See* Exh. 8 Vol. VI Docket No. 21-7 at 1530; Exh.

A-C Vol 1 Docket No. 21-2 at 1-159.  By the California Supreme Court's own admission, it is now

clear that (unlike state and federal civil and criminal law), it is impossible to raise post-judgment

constitutional claims for attorney discipline matters before the California Supreme Court.  Both

state and federal civil procedure rules and statutes have mechanisms to vacate judgments either by

motion in the relevant case or independent lawsuits in equity for constitutional and certain other

violations after entry of judgment.  *See, e.g.*, Fed. R. Civ. P. 60(b); Cal. R. Civ. P. §663a;

*Kougasian v. TMSL, Inc.,* 359 F.3d 1136 (9th Cir. 2004); *Olivera v. Grace,* 19 Cal.2d 570, 574-5

(1942).  Accepted grounds for vacating a judgment include absence of due process, particularly

lack of notice and judicial bias.  *See, e.g. Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S.

847, 862-64 (1988) (judgment may be vacated at any time after decision once new facts are learned and relief diligently requested);  *Urias v. Harris Farms, Inc.,* 234 Cal. App.3d 415, 424-425 (1991) (trial court judge's judgment may be attacked for judicial bias once facts are discovered of such bias and relief diligently requested) *but see Kaufman v. Court of Appeal*, 31 Cal.3d 933 (1982) (for California appellate justices, no motion to disqualify Court of Appeal and Supreme Court justices; Court of Appeal justice who fails to *sua sponte* recuse may be subject to petition for review for actual bias as to which prejudice can be shown.)

On the criminal law side, post-judgment convictions are subject to constitutional attack via *habeas* petitions, and relief sometimes comes many years after the original conviction judgment. *See, e.g.*, Cal. Penal Code §1473, Order Granting Habeas Relief, *Williams v. Davis,* 00-cv-10637-DOC (C.D. Cal. Mar. 29, 2016)(granting habeas relief after demonstration of prosecutor misconduct and witness recantations and pointing out that "the federal courts grant habeas relief in California capital cases in well over half the cases they review").   As bar proceedings are quasi-criminal, the comparison to the unlimited time limit for submission of newly discovered evidence of a constitutional violation is most apt.

The California Supreme Court's procedural bar to presenting constitutional arguments by Sanai fell into place on March 30, 2023.  Sanai had only 20 days to review the State Bar's redacted reports and prepare a petition for rehearing based thereon.  His request for an extension of time was denied.  Exh. 8 Vol. 6 at 1531 Docket 21-7.

Sanai filed his petition for rehearing on March 30, 2023 then decoded the State Bar's reports to discover that the lawyer that the California Supreme Court appointed as State Bar Board Chair when Girardi's criminal conduct was first revealed, Sean SeLegue, was the key lawyer who protected Girardi and Walter Lack from reciprocal discipline arising from *In Re Girardi,* 611 F.3d 1027 (9th Cir. 2010).  This was picked up by website law360.com the next day. *See* Exh. CCCCC, Vol. V, Docket 21-6 at 1330-3.  Sanai filed a motion to file an amended petition for rehearing on April 3, 2023 which was denied, but the finality date was extended while the Court looked over the petition.  Exh. 8 Vol. 6 Docket 21-7 at 1531. After that occurred, the State Bar revealed it had criminally referred certain of its past employees and made referrals to the Fair Political Practices

-27-

1   Commission. *Lowrey, supra.* Soon thereafter the State Bar's referral letter to the Fair Political

2   Practices Commission was released, Exh. EEEEE Vol. VII Docket No. 22-3, showing that the first

3   hearing department Judge in Sanai's State Bar Court proceedings, Donald Miles, was part of the

4   Girardi Cabal in the State Bar who failed to report his gifts.

5       The procedural bar on presenting post-judgment arguments to the California Supreme Court,

6   including constitutional arguments, where the grounds for the delay in presenting the arguments is

7   the misconduct of the State Bar, eliminates the application of *Younger* abstention under the case

8   law. Where a state prosecuting body has a *Brady* or *Brady*-like obligation to furnish exculpatory

9   evidence, the weak incentives to do so require that the prosecutors face a perpetual risk of having

10  their misconduct discovered. *See United States v. Olsen,* 737 F.3d 625, 626, 632 (9th Cir. 2013)

11  ("There is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to

12  it….When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite

13  their repetition."--Kozinski, C. J., diss.). Here, even though under *In re Jenkins*, *supra*, the duty to

14  produce exculpatory evidence continues, because of the procedural bar, the risk of having the

15  misconduct discovered and undoing attorney discipline ends on the deadline for filing a petition

16  for rehearing. No such limitation exists in civil or criminal law.

17              c.      The Current Chief Trial Counsel of the State Bar Has a
                        History of Fighting to Withhold Relevant Documents he
18                      is Obligated to Disclose,

19      The State Bar's disclosure problem is exacerbated by the current leadership of the State Bar

20  prosecutors. George Cardona, the current head of the Bar's prosecution function, is no stranger to

21  *Brady* violations. *See* Exh. JJJJ, Vol. V, Docket No. 21-6 at 1249 Docket No. 21-6 (identifying

22  Cardona). Cardona was castigated by this Court for seeking to excuse one of the more flagrant

23  *Brady* violations in the Ninth Circuit case law: *United States v. Kojayan,* 8 F.3d 1315 (9th Cir.

24  1993).

25      In *Kojayan,* Jeff Sinek, currently a partner at Kirkland & Ellis, was the Assistant U.S. Attorney

26  acting as the trial attorney in a narcotics distribution case. *See Kojayan* at 1316 (identifying Sinek

27  as an author of the appellate brief); 1319 (stating "[t]he matter becomes more serious once the

28  issue was joined on appeal…While upbraiding opposing counsel for alleged misstatements, the

prosecutor was far more forgiving when it came to his own conduct. To begin with, he didn't even then acknowledge that he had told the jury something that wasn't true.").

Cardona was an author of the supplemental brief regarding the misconduct of Mr. Sinek, the Assistant U.S. Attorney in this matter. *See Kojayan* at 1316 (identifying Sinek and Cardona as authors of the supplemental brief).

The supplemental brief filed by Mr. Cardona constituted prosecutorial misconduct and failed to recognize the violation of *Brady* duties of Mr. Sinek:

> Troubled as we are by the prosecutor's conduct, we're more troubled still by the lack of supervision and control exercised by those above him. The AUSA's superiors seem to have been unaware that anything at all was amiss until after oral argument in this court. It was during that argument that the government first disclosed Nourian's status:
>
> [Q]: Was there a cooperation agreement?
>
> AUSA: Well, your honor, that is not something that's in the record.
> [Q]: I understand. Was there a cooperation agreement?
>
> AUSA: There was an agreement with the Southern District of New York and [Nourian], yes.
> Transcript of 11/5/92 Oral Argument at 15.
>
> How can it be that a serious claim of prosecutorial misconduct remains unresolved — even unaddressed — until oral argument in the Court of Appeals? Surely when such a claim is raised, we can expect that someone in the United States Attorney's office will take an independent, objective look at the issue. The claim here turned entirely on verifiable facts: A dispassionate comparison between the transcript of the AUSA's statement to the jury and Nourian's plea agreement would have disclosed that the defense was right and the government was wrong. Yet the United States Attorney allowed the filing of a brief in our court that did not own up to the problem, a brief that itself skated perilously close to misrepresentation. *See* p. 1319 notes 7 8 *supra*.
>
> But that's not all. After the oral argument before us, we gave the government an opportunity to rethink its position. Order of 11/5/92. The United States Attorney wrote us a week later, saying he'd "now had an opportunity to review the issues raised in these appeals" and requesting that he "be afforded an opportunity to modify our position regarding the nature of certain statements made by government counsel during closing argument." Letter of 11/12/92. Having granted the additional time, *see* Order of 11/13/92, we infer that the Supplemental Brief filed on November 30, 1992, is the United States Attorney's reasoned response to the issue.

**This supplemental brief falls disappointingly short**. While for the first time "recogniz[ing] and conced[ing] that the prosecutor's comments in closing argument were "misleading" and "improper," Government Supp. Brief at 1, 11 n. 2, the new brief is remarkably similar in approach to the government's original brief. Its two-part strategy is to minimize the prosecutor's misconduct and place the blame for it on opposing counsel. Thus, the government tells us the AUSA's comments "were limited in nature and, as the district court recognized, were prompted by defense counsel's own improper attempt to focus the jury's attention on matters outside the record," *id.* at 2, and that "[t]he prosecutor's remarks, albeit misleading, were an isolated instance of error prompted by defendants' improper reference to matters outside the record," *id.* Both prongs of the government's analysis deserve careful attention.

....

While casting aspersions at opposing counsel, the government's supplemental brief overlooks two significant differences between defense counsel's argument and its own. First, unlike defense counsel, the prosecutor went well beyond asking the jury to infer matters outside the record. He actually made unsupported factual claims. When a lawyer asserts that something not in the record is true, he is, in effect, testifying. He is telling the jury: "Look, I know a lot more about this case than you, so believe me when I tell you X is a fact." This is definitely improper.

Defense counsel also asked the jury to infer only things that he believed in good faith might be true. While defense counsel didn't know that Nourian had a cooperation agreement, see p. 1317 *supra*, he had no reason to doubt it. **The government's lawyer, by contrast, made factual assertions he well knew were untrue. This is the difference between fair advocacy and misconduct.** Compare note 7 supra.

.....

Nor are we impressed by the second prong of the government's supplemental brief, which is to minimize the effect of the prosecutor's misconduct. **While the government eleven times refers to the AUSA's argument to the jury as "misleading," not once does it call it "false" or "untrue." This distinction matters. False and untrue mean contrary to fact; "misleading" suggests something literally correct, but likely to direct the listener away from the truth. Footnote 1 of the government's supplemental brief, in fact, boldly asserts the AUSA's comments "were, to some extent, technically accurate. The prosecutor did not state that Nourian had not entered into a cooperation agreement, but rather only noted that there `was not a shred of evidence' relating to such an agreement." Government Supp. Brief at 9 n. 1 (emphasis added).**

**How can the government possibly say this?** Unlike defense counsel, who carefully preceded each departure from the record with a qualifier like "I submit," the prosecutor categorically asserted that Nourian "has Fifth Amendment rights. He has the right to remain silent." The AUSA also admonished the jury: "Don't be misled that the government could have called Nourian." Contrary to the government's characterization, the prosecutor much more than "only noted that

there `was not a shred of evidence' relating to such agreement" in the record; he told them point-blank that no such agreement existed. In a misguided attempt to stand by its lawyer, the government sweeps under the rug the most troublesome part of his statement to the jury.

**As disappointing as what is said in the government's supplemental brief is what is not said. While the government condemns opposing counsel for speculating about the existence of the cooperation agreement, the government lawyers who supposedly took a detached and independent look at the problem never once mention why it became necessary for defense counsel to speculate. After all, the defense had made a *Brady* request about whether Nourian had signed a cooperation agreement, and the government had a continuing obligation to provide *Brady* materials to the defense.** If, before trial, the AUSA was uncertain about the materiality of Nourian's plea agreement, he could have submitted it for the district court's in camera inspection and evaluation. *See United States v. Gardner,* 611 F.2d 770, 775 (9th Cir. 1980). When defense counsel later requested a missing witness instruction and their request foundered because they were unaware of the government's agreement with Nourian, the government was required, under Brady, to disclose this evidence. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97. The evidence was "favorable to [the] accused" because it might have convinced the court to give the instruction. *Id.* The instruction, in turn, would have told the jury that Nourian was not only available but that the prosecution could compel his appearance if it so chose. This might have led the jury to infer that his testimony would have been unfavorable to it. Even if the court refused to give the instruction, evidence of Nourian's agreement would have strengthened defense counsel's argument to the jury that his live testimony would have explained away his hearsay testimony. This case was close, and we find a "reasonable probability" that, had this evidence been disclosed, the result would have been different; the evidence was therefore material. *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987).

**Most disappointing of all, perhaps, is the government's failure to acknowledge that the prosecutor's misconduct was far more than a simple slip of the tongue, more than a temporary misstep.** As we discussed at some length above, the Assistant United States Attorney did nothing whatever to own up to the problem; he did not inform the district court, this court or opposing counsel of the misstatement of fact in his closing argument. Before us, more than a year after trial, in a brief the AUSA tells us "was reviewed by the chief of our appellate section," Transcript of 11/5/92 Oral Argument at 17, the government continued to argue that the prosecutor's conduct was proper, denied any wrongdoing and characterized his statements as a "fair response" to defense counsel's argument, Government Brief in Kojayan at 23. Nor does the government's supplemental brief explain why it took questions from us at oral argument before the government would disclose the cooperation agreement; why it was only after an order from this court that the United States Attorney finally "recognize[d] and concede[d] that the prosecutor's comments in closing argument were misleading" and "improper."

While the government's supplemental brief contains various references to the "regrettable and inappropriate" nature of the incident, Government Supp. Brief at

MEMORANDUM OF POINTS AND AUTHORITIES

9 n. 1, it shows no appreciation of the seriousness of the misconduct, no hint of contrition. Remarkably, the government argues that we needn't worry too much about the AUSA's misstatement because "[t]he effect of the prosecutor's improper comments was, in essence, the same as if the prosecutor had followed the proper course and requested intervention by the district court." *Id.* at 11 n. 2. Acceptance of responsibility this is not.

*United States v. Kojayan,* 8 F.3d 1315, 1320-1323 (9th Cir. 1993) (footnotes omitted, bold emphasis added) (Kozinski, J).

Cardona was the primary author of the supplemental brief castigated by former Judge Kozinski and the panel, and Cardona and his colleagues benefitted from the State Bar's avoidance of addressing misconduct, particularly *Brady* violations, by prosecutors, as *Kojayan* sets out conduct that would be subject to serious attorney discipline under the relevant rules and statutes at the time, particularly former Cal. Rules Prof. Cond. 5-220, now Cal. Rules Prof. Cond. 3.4(b). Cardona's history as a federal prosecutor demonstrates that he does not take *Brady* disclosure obligations seriously, and indeed should have himself been the subject of attorney discipline for violating *Brady* disclosure obligations.  This makes the Supreme Court's procedural bar to raising constitutional arguments post-judgment all the greater as disqualifying the application of *Younger* abstention where the State Bar has revealed the existence of thousands of documents that should have been disclosed to attorney respondents in order to impeach State Bar prosecutors and show, among other things, compensating bias under *Bracy v. Gramley,* 520 U.S. 899 (1997) and *Gacho v. Wills,* 986 F.3d 1067 (7th Cir. 2021). *See* Complaint, Docket No. 1 at 6:12-19, 8:25-9:6.

c.      The Complaint Alleges a Right to Relief.

Sanai's Complaint was filed on March 9, 2023.  Docket No. 1.  The next day the State Bar issued the Halpern May report, the Lazar Report, and a press release, in which it confessed to a deep-rooted culture of corruption and disregard for ethical duties.  See Exhs. A-C Vol I Docket No. 21-2.   Both reports were heavily redacted and are incomplete; nonetheless, they demonstrate the scale of the State Bar's corruption and that the State Bar was aware of its internal corruption since 2012 but failed to make the required disclosures to attorney respondents.  The Complaint therefore does not contain all of the relevant evidence regarding the State Bar's corruption or its failure to comply with its statutory *Brady* disclosures, which constitute federally enforceable

violations of the duties of the State Bar's attorneys.  *See* Cal. Bus. & Prof. Code §6085(b).  The complaint did however make factually correct allegations which set out the relevant legal theories for recovery.

Sanai's Complaint asserts three causes of action.  The first requests declaratory and (if available) injunctive relief for violation of civil rights under 42 U.S.C. §1983; the second is an equitable action for injunctive relief against state officials in their official capacity under *Armstrong v. Exceptional Child Center, Inc.,* 135 S.Ct. 1378, 1384 (2015); and the third is for declaratory judgment under 28 U.S.C. §2201.  No damages are requested, and for purposes of this default judgment, attorney's fees and costs are waived, so judicial immunity for damages is waived.  Because relief under 42 U.S.C. §1983 against a state judicial officer must first be declaratory relief, if available, declaratory relief is requested thereunder and under the Declaratory Judgment Act.

There is no judicial immunity of any kind from prospective injunctive relief.  *Pulliam v. Allen,* 466 U. S. 522, 541-2 (1984); *Moore, supra* at 1104.  In its role as regulator of attorneys, State high courts are subject to suit when challenges are made to state court judicial rules no matter how promulgated or to prosecutorial immunity for enforcement of attorney discipline.  *Supreme Court of Virginia v. Consumers Union of United States, Inc.,* 446 U. S. 719 (1980).  As none of these functions carry with them immunity from injunctive or declaratory relief, and judicial immunity does not either, there is no issue of immunity.

Prospective injunctive and declaratory relief includes relief addressing continuing adverse effects of past misconduct, provided that injunctive or declaratory relief can terminate such effects if granted at the time the complaint was filed.  The standard for standing for injunctive or declaratory relief in the Ninth Circuit and indeed under United States Supreme Court law is well established:

> To have standing to seek to enjoin Facebook's private message practices, Plaintiffs must show "either 'continuing, present adverse effects' due to [their] exposure to [Facebook's] past illegal conduct or 'a sufficient likelihood that [they] will again be wronged in a similar way.' " *Villa v. Maricopa County ,* 865 F.3d 1224, 1229 (9th Cir. 2017) (*first quoting O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ; *then quoting City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ).

*Campbell v. Facebook, Inc.,* 951 F.3d 1106, 1119-20 (9th Cir. 2020).

> Suspension of a license constitutes continuing, present adverse effects:
>> [T]here is no question that Convoy can satisfy the "injury-in-fact" requirement with regard to the revocation and suspension procedures employed by the City in suspending Convoy's license. *See Desert Outdoor Advertising, Inc. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir. 1996) ("[A]ppellants suffered an injury in fact because the City actually brought an enforcement action against [them]."). Convoy therefore has standing to maintain a facial challenge to the lack of procedural safeguards associated with those procedures. *See Baby Tam,* 154 F.3d at 1100.

*4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108, 1113 (9th Cir. 1999)

Sanai's complaint contends that his bar proceedings lacked the minimum guarantees of due process on a facial and "as applied" basis, and relief should be granted to address the facial and "as applied" constitutional defects that can be rectified by the California Supreme Court.  The facial deficiencies in the rules applicable to proceedings before the California Supreme Court are alleged as follows:

1.     There is no procedural mechanism for disqualifying appellate court judges in California, unlike trial court judges, making it impossible to ensure that the tribunal is impartial under the standard of *Caperton v. A. T. Massey Coal Co.,* 556 U.S. 868 (2009) or for actual bias, or under state law.  *See Kaufman, supra* at 940 ("The record in this case demonstrates, we believe, that the diverse problems of appellate disqualification are too comprehensive and too complex for effective procedural rulemaking by courts, including this court.")

2.     Unlike for trial court judges, there is no mechanism to conduct discovery to obtain admissible evidence of an absence of judicial impartiality under the standard of *Caperton, supra*, or for actual bias or under state law.

3.     California does not recognize the existence of compensating bias under *Bracy v. Gramley,* 520 U.S. 89 (1997)  and *Gacho v. Wills*, 986 F.3d 1067 (7th Cir. 2021)  or the right to inquire into it with discovery.

4.     The standard on review for evaluating whether an appellate justice must be disqualified in California is NOT the standard applicable to trial court judges under California law or under federal law, but a different standard requiring a showing of actual bias and prejudice:

1
2
3
4
5
6
7
8
9

"Because of his bias, did the appellate proceeding wherein a justice participated become illegally and prejudicially unfair?" *Kaufman, supra*, at 940.  This standard is not the federal standard, which does **not** require a showing of actual bias or prejudice.  *Williams, supra* at 1905-1909 (in applying federal standard, "Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is `likely' to be neutral, or whether there is an unconstitutional `potential for bias.'" and "a due process violation arising from the participation of an interested judge is a defect "not amenable" to harmless-error review") And there is no standard as to the grounds that a Supreme Court justice is to employ.

10
11

5.      California law excludes consideration of any judge or justice's statements or ruling in determining disqualification, *Guerra, et. al. supra.*

12
13
14
15

Sanai's "as applied" challenges are based on the (now-admitted) decades of corruption in the California State Bar and judicial system created by Girardi and his cabal, such as State Bar investigator Tom Layton, and their relationships with specific Supreme Court justices.  *See, generally*, Exhibits A-C Vol. I Docket No. 21-2.

16
17
18
19
20
21
22
23
24
25
26
27

6.      Sanai in the course of representing Peyman Roshan in a Department of Real Estate reciprocal discipline matter issued a subpoena to the California Supreme Court the main purpose of which was to obtain records of express findings in Roshan's State Bar disciplinary matter because the DRE action against him was based solely on Cal. Bus. & Prof. Code §10177 which requires the reciprocal action to be based on an action which included "an express finding of a violation of law by the agency," *id.* at § 10177(f).   The California Supreme Court, when denying petitions for review of disciplinary recommendations, is deemed only to have accepted the recommendation of discipline, *In re Rose*, 22 Cal.4th 430, 436 (Cal. 2000), and not the State Bar Court's reasoning.  It may thus impose discipline "[e]ven if an attorney … presents a prima facie claim of legal or factual error…if [the Court's] independent examination of the record and evaluation of the attorney's factual and legal assertions establish that the recommended discipline should be

28

imposed," *id.* at 460.  In the DRE proceeding, reciprocal discipline may be imposed only if Roshan "[a]cted or conducted [himself] in a manner that would have…had [his law]…suspended…for acts that, if done by a real estate licensee, would be grounds for the suspension or revocation of a California real estate license," Cal. Bus. & Prof. Code §10177.  The State Bar disciplinary recommendation to the Supreme Court included acts for which only an attorney would be subject to discipline, not a real estate licensee, so it is necessary to see the factual and legal determinations of the Defendants then serving on the California Supreme Court for Mr. Roshan to fairly fight the DRE reciprocal discipline matter.  Under the federal *Caperton* standard, a reasonable person would find in this situation an unconstitutionally high risk of bias; there is no requirement to show prejudice or error that is not harmless.  However, under *Kaufman*, the standard for recusal is "actual bias that is prejudicial" to the proceeding.

7.   Both State Bar Hearing Department Judges who presided over Sanai's case were part of Girardi's Cabal.  Docket 1 Complaint at 12-13.  Sanai sought the disclosure of Judge Valenzuela's connection to Girardi, but was denied by the Defendants.  He had no notice until the Halpern May report was published that Judge Miles had a relationship with Girardi, which now makes his rulings explicable.  The State Bar had and continues to have an ethical duty to disclose such exculpatory facts, which it refuses to comply with.

8.   Justice Kruger had sufficient ties to Girardi that she disqualified *herself* in a case involving public disclosure of his bar records in response to a motion made by Sanai.  *See* Exh. Z Vol III Docket No. 21-4 at 566-7 (orders of December 1, 2021 and December 2, 2022); Exh. 6 Vol. VI Docket No. 21-7 at 1488-9.   She refused to disclose the nature of her relationship.  She therefore had a disqualifying financial interest as to any litigation which sought to raise *Bracy* and *Gacho* compensating bias as to State Bar Court Judges, including Cynthia Valenzuela, regarding Girardi, where the same issue exists regarding her.  *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813 (1986).  In particular, Justice Kruger has a conflict of interest under the constitutional standard of *Caperton, supra,* in adjudicating any State Bar

proceeding where the respondent attorney asserts a *Bracy* theory of discovery founded on Girardi's corruption of the State Bar, as she would be a target of such discovery. However, she did **not** recuse in Sanai's petitions for review and rehearing in his disciplinary proceeding, and there was no mechanism to make her recuse.

9. Justices Joshua Groban was the intermediary between Girardi and former Governor Jerry Brown. Girardi had a veto over all judges appointed by Brown. Groban's job for eight years was ensuring that Girardi's hold over the judiciary was rock-solid. He therefore had a disqualifying financial interest in litigation which sought to raise *Bracy* and *Gacho* compensating bias as to State Bar Court judges in Sanai's case, including Cynthia Valenzuela, regarding Girardi, where the same issue exists to him but did not recuse and there was no mechanism to make him recuse. Justice Groban also has a disqualifying personal interest to not have publicly revealed the extent to which his activities gave Girardi carte blanche in California Courts over a decade to his role in appointing them. *Aetna Life Ins. Co., supra.* In addition, Girardi was known for lavishly wining, dining and entertaining the judiciary, members of the State Bar, and government officials like Groban. "While the bar closed case after case with little or no investigation, the attorney kept up his image as a billion-dollar litigator who had the governor on speed-dial and scores of judges eager to attend his lavish parties." Exh. GG Vol. III at 639; *see also* K. Reich, *supra* (discussing Girardi cruise for state and federal judges). Recent events have demonstrated that receipt of lavish trips and parties bears negative consequences for high court justices. *See* C. Hulse, "Harlan Crow Declines to Provide Information Sought by Senate Democrats", *New York Times,* May 23, 2023 at A1.

10. Justices Meryl Jenkins was the intermediary between Girardi and Governor Gavin Newsom. Jenkins, like Groban, was tasked to ensure that Girardi's hold over the judiciary was rock-solid. He therefore had a disqualifying financial interest in litigation which sought to raise *Bracy* and *Gacho* compensating bias as to State Bar Court judges in Sanai's case, including Cynthia Valenzuela, regarding Girardi, where the same issue exists to her,

but did not recuse and there was no mechanism to make him recuse. He also has a disqualifying personal interest to not have publicly revealed the extent to which his activities gave Girardi *carte blanche* in California Courts over a decade to his role in appointing them. *Aetna Life Ins. Co., supra.* In addition, Girardi was known for lavishly wining, dining and entertaining the judiciary, members of the State Bar, and government officials like Groban. "While the bar closed case after case with little or no investigation, the attorney kept up his image as a billion-dollar litigator who had the governor on speed-dial and scores of judges eager to attend his lavish parties." Exh. GG Vol. III at 639; *see also* K. Reich, *supra* (discussing Girardi cruise for state and federal judges). Recent events have demonstrated that receipt of lavish trips and parties bears negative consequences for high court justices. *See* C. Hulse, *supra*.

The secondary evidence regarding Girardi's influence in the California judicial system is overwhelming in the Halpern May Report published by the bar and press investigations:

> We also heard of rumors that Girardi could have executive leaders at the State Bar removed at his request, and reports that Girardi could facilitate or prevent judicial appointments.

Exh. C Vol. I Docket No. 21-2 at 62.

> Girardi reportedly advised multiple California governors on judicial appointments and helped numerous lawyers become judges." Exh. C Vol. I at 74.
> As the press reporting indicates, Girardi's political connections played a significant role in his ability to influence judicial appointments, both state and federal. Miller reported that he believed that at least for certain periods of time, Girardi had the power to prevent someone from becoming a judge if he wanted to. Girardi also made financial donations to judicial election campaigns.

*Id.* at 75.

> Keeping with Girardi's reported focus on building relationships, multiple witnesses reported that Layton offered Girardi's assistance in the development of their careers, particularly if they were seeking judicial seats in the future.

*Id.* at 79.

> In her interview, Kim said that Tom Layton came to her when she first became Chief Trial Counsel to offer assistance from Tom Girardi in helping her to become a judge or to achieve some other professional goal. Although Layton denies this, it is undisputed that Dunn made similar offers (without necessarily mentioning Girardi) to various Bar Presidents. Both Dunn and Craig Holden have

-38-

confirmed that Dunn initiated a discussion in which Dunn asked how he could help Holden achieve any aspirations he had of becoming a judge or running for office. (Holden says that Dunn also offered Layton's assistance, and Layton and Holden both confirm that Holden later asked Layton to meet with a friend whom Holden recommended for a district court position.) While not recalling necessarily that he initiated other conversations, Dunn admits to making similar offers to Luis Rodriguez, who openly had political aspirations, and Jon Streeter, who wanted to become a judge.

Exh. U Vol. III Docket No. 21-4 at 529.

"While the bar closed case after case with little or no investigation, the attorney kept up his image as a billion-dollar litigator who had the governor on speed-dial and scores of judges eager to attend his lavish parties.

Exh. GG Vol. III Docket No. 21-4 at 639.

A major Democratic fundraiser since the 1970s, Girardi had the ear of governors and became known widely as a judgemaker who could secure or doom appointments to the bench.

Exh. II Vol. III Docket No. 21-4 at 683.

A major Democratic Party donor, [Girardi] socialized with politicians and judges and was regarded as a gatekeeper for would-be judges across Southern California.

Exh. PP Vol. III Docket No. 21-4 at 753.

The Los Angeles legal legend was a major party donor for decades, a self-described "limousine liberal" who bragged about the influence his money bought him in the selection of judges.

Exh. UU Vol. III Docket No. 21-4 at 791.

Beginning in the 1970s, when he developed a friendship with Gov. Jerry Brown, he positioned himself as a gatekeeper between aspiring judges in Southern California and governors who make appointments to the Superior, Appellate and Supreme court benches. He often recounted backroom meetings where he and other powerful lawyers met to decide which of their colleagues should be elevated to the bench.

*Id.* at 798.

[In his memoir, Girardi] described numerous dinner parties at his Pasadena home that ended with Brown surprising one of Girardi's associates by swearing him in as a judge on the spot.

*Id.*

His sway in the process continued through the governorship of Newsom, who named him in 2019 to a committee vetting judicial candidates in L.A.

*Id* at 799.

1

2

3

4

5

6

7

8

> Nicholas Rowley, a plaintiff's attorney with a national reputation, said that when he threatened to sue Girardi in 2004 for failing to pay hundreds of thousands of dollars in legal fees from joint cases, the older lawyer replied, "Go ahead and try."
>
> "I know every judge in L.A.... I got most of them appointed," Rowley recalled Girardi saying.
>
> After consulting with other lawyers, Rowley decided it was not in his interest to sue, he said. He and Girardi never again worked on cases together, but they occasionally co-hosted political fundraisers.
>
> "If Tom called on you to be part of something or to give money, you didn't say no because he had the ability and the power to make or break people," he recalled.

*Id* at 799-800.

Girardi's power in state courts arose from his power to appoint and promote judges in the state court system due to his relationships with Governors Brown and Newsom; Justices Groban and Jenkins were the individuals in their respective administrations that translated Girardi's desires into nominations. Docket 1 Complaint at 2-3, 5-6.  Both have refused to make any public disclosures about their relationship.  "Brown's advisor on judicial appointments, Joshua Groban, and the man who held the same role in Newsom's administration, Martin Jenkins, are both now justices on the state Supreme Court and did not respond to interview requests made through a court spokesman." Exh. UU Vol. III Docket No. 21-4 at 799.

Under the appearance-based standard in *Caperton,* Justice Groban and Justice Jenkins involvement in Sanai's State Bar case would have a constitutionally intolerable risk of absence of impartiality.  Yet they did not recuse themselves in either proceeding that presented these issues.  Exh. 7 Vol. VI Docket No. 21-7 at 1493-4; Exh. 8 Vol. VI Docket No. 21-7 at 1529-32.  Likewise, Justice Kruger, who recused herself from the *Los Angeles Times* case due to a relationship with Girardi she refused to disclose, should have recused herself from Sanai's case or disclosed the relationship.   A judge's acknowledgement of grounds for recusal in a matter involving a criminal without disclosing the reason but refusal to recuse themselves in another matter involving said criminal's illegal conduct constitute a violation of the *Caperton* standard, as there is a constitutionally intolerable risk of absence of impartiality.  *Caperton, supra.*

Sanai's complaint adequately pleads the constitutional failings of the California State Bar and appellate processes and his substantive claim is meritorious.  These two factors point to entry

MEMORANDUM OF POINTS AND AUTHORITIES

of default judgment.  However, more information arose after the filing of the Complaint that is relevant.

Sanai's motion sets out the theory that Justices Groban, Jenkins and Kruger have a financial interest in ensuring that no additional investigation or fact-finding is made into Girardi's influence in the state judicial system, whether by discovery by attorney respondents in State Bar proceedings or mandatory disclosure under Cal. Bus. & Prof. Code §6085(b).  Complaint at 8, ¶19 ("because a majority of justices do not want their relationships with Girardi publicly disclosed and examined."), Docket No. 1.

On June 6, 2003, law360.com published an article concerning the referral of State Bar employees, including the State Bar Court judge who first handled Sanai's case, which sets out the factual predicates for a related due process problem for Justices Kruger, Groban and Jenkins to rule on state bar proceedings where a person, like Sanai, is demanding comprehensive disclosure by anyone in the State Bar about the connections with Girardi, and discovery against Girardi's bankruptcy estate regarding such matters. B. Lowrey, "Calif. Bar Referred 7 Ex-Employees To Political Watchdog", law360.com, June 6, 2023.

As the article explains:

> The State Bar of California has reported seven former employees to a political watchdog agency for failing to disclose cash or gifts from the scandal-marked Girardi Keese law firm, according to records obtained by Law360.
> Over the past decade, the bar said, celebrity trial lawyer Tom Girardi treated many of the then-bar officials to opulent parties and luncheons, tickets to shows and sporting events, while a steady stream of clients accused him of misconduct. None of this was reflected in the ex-employees' annual conflict-of-interest filings, according to the bar's letter to the California Fair Political Practices Commission.
> …..
> Donald Miles, who was a State Bar Court Judge from 2006 to 2018, attended a Consumer Attorneys Association of Los Angeles convention party and Super Bowl party hosted by Girardi Keese, and may have attended a Christmas Eve luncheon in 2013, the bar said. He was also hosted by the firm at a 2013 award dinner and a non-profit luncheon. The referral letter said he did not report Girardi or Girardi Keese as a source of those gifts.
> ….
> Greenberg declined to comment. Dunn, Nowicki and Miles did not respond to requests for comment this week.
> Layton and Oehler could not immediately be reached for comment this week.

MEMORANDUM OF POINTS AND AUTHORITIES

1

2   Their former attorney, Bob Baker of Baker Keener & Nahra, suggested that few at
    the bar complied with annual conflict-of interest filings, known as Form 700s.
        "How many employees of the State Bar filed a Form 700," Baker wrote in an
    email to Law360. "I would assume way less than 50%."

3   *Id.; see also* Exh. EEEEE Vol. VII Docket No. 22-3.

4       Girardi's lavishing of free hospitality on judges and public officials was notorious and

5   invitations were coveted.  The fight for tickets to such events was fierce; one former California

6   appellate justice tried to use a ticket as a lure to seduce a young lawyer; when that failed, the

7   justice and his friends took her to Girardi's party and tried to bed her.  *See In Re Jeff Johnson*, Cal.

8   Jud. Performance Comm'n, Decision Removing Jeff Johnson (June 2, 2020)  at 56-7; C. Sanai

9   Decl. filed herewith ¶29.

10      According to the State Bar, a failure to report attendance at a Girardi Super-Bowl party or his

11  legendary Las Vegas dinner and party is an offense under California law that can trigger financial

12  penalties of up to $5,000.00. Vol. VII Docket No. 22-3.  That determination imperils dozens if not

13  hundreds of California judges and public officials who attended Girardi's parties and dinners but

14  who failed to file Form 700s.  Sanai reviewed the Form 700 disclosures for Justices Groban,

15  Jenkins, and Kruger from September 2016 onwards.   C. Sanai Decl. filed herewith ¶30.   Not a

16  single free dinner (other than ones accompanying speeches, which public officials are allowed to

17  accept) from anyone is disclosed.  Either the Justices never accepted invites to legal functions

18  where someone else gave a speech for free or got taken out to dinner by a lawyer, or they did not

19  make any disclosures.  The answer of course is that they are invited and attend all the time.  The

20  State Bar's position that dinners and paid for travel over $50 is correct as a matter of law, and it is

21  clear that California jurists are not complying with it.

22      Justices Groban, Jenkins and Kruger bear significant legal and financial risk if Sanai's

23  demands for exculpatory evidence and discovery of information concerning Girardi were found to

24  be meritorious.  That's because the evidence includes judges on the invitation lists that the State

25  Bar has examined in the Halpern May report.  Justices Groban, Jenkins and Kruger, and indeed the

26  other justices, have a financial interest in keeping these lists secret, whether or not they ever

27  attended one of the affairs, because of the costs of addressing the question through legal counsel

28  and proving non-attendance at one of Girardi's affairs could equal the fines.   There is a

MEMORANDUM OF POINTS AND AUTHORITIES

constitutionally intolerable risk that jurists such as Groban, Jenkins and Kruger will be biased against any litigant such as Sanai whose legal claims before them include demands for disclosure of detailed information concerning Girardi's corruption of the State Bar and the judiciary, as it put them at risk of investigation and personal payment of legal fees to defend against investigations into judicial carousing at Girardi's expense, plus fines when found to have violated the statute.

There is a second dimension. As pointed out in the State Bar's letter, concealment of information by public official tolls the limitations period for crimes or civil penalties committed during office. *See* Exh. EEEEE Vol. VII Docket No. 22-3 at 1541.   The refusal to reverse Judge Valenzuela's ruling barring Sanai from obtaining information relevant to his accusations of corruption had the effect of concealing any misconduct that they may have committed that otherwise passed the limitations period. *See* Exh 5, Vol. VI Docket No. 21-7 at 1484-5.  There is a constitutionally intolerable risk that jurists such as Groban, Jenkins and Kruger will be biased against any litigant such as Sanai whose legal claims before them include demands for disclosure of such information that extends the limitations period for any claims of failure to disclosure reportable information, even the jurists are in fact innocent, if Girardi's invitation lists could include them.

### 3.   Amount at Stake

Sanai requests no damages.  In such a situation a Central District judge held that:

> Under the third *Eitel* factor, the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct. In the instant case, Plaintiffs are not seeking monetary damages. They seek only injunctive relief from the continued use of their trademarks on Defendant's counterfeit products. Accordingly, this factor favors granting default judgment.

*PepsiCo, Inc. v. California Security Cans,* 238 F. Supp. 2d 1172, , 1176-7 (C.D. CA 2002)

In this case as well the absence of any request for damages and waiver in this default judgment of costs and attorney's fees favors granting default judgment.

### 4.   The Possibility of Dispute Concerning Material Facts.

The analysis of this factor in *PepsiCo, supra,* applies here as well:

-43-

1

2

> The fifth *Eitel* factor considers the possibility of dispute as to any material
> facts in the case. Upon entry of default, all well-pleaded facts in the complaint are
> taken as true, except those relating to damages. *See TeleVideo*, 826 F.2d at 917-
> 18. Accordingly, no genuine dispute of material facts would preclude granting
> Plaintiffs' motion.

3

4

*PepsiCo, supra.*

5

With respect to the facial deficiencies in California procedure, there is no possibility of any

6

dispute under any circumstances as the facial defects arising from the case law and applicable

7

rules and statutes.

8

## 5.  Default is Product of Excusable Neglect

9

The Ninth Circuit employs a sliding scale for what is considered excusable neglect based on

10

the legal sophistication of the defendants.

11

12

13

14

15

> As this summary of our cases shows, we have tended to consider the defaulting
> party's general familiarity with legal processes or consultation with lawyers at the
> time of the default as pertinent to the determination whether the party's conduct in
> failing to respond to legal process was deliberate, willful or in bad faith….Absent
> some explanation…it is fair to expect that individuals who have previously been
> involved in litigation or have consulted with a lawyer appreciate the consequences
> of failing to answer and do so only if they see some advantage to themselves.

16

*TCI Group Life Ins. Plan v. Knoebber,* 244 F.3d 691, 699, fn. 6 (9th Cir. 2001).

17

With legal sophistication as a critical factor, defendants who are justices of a State high court

18

will have to meet the most exacting standard under the law, and, Sanai submits, the most exacting

19

standard under their state law.

20

However, it is highly unlikely that the Defendants' default is due to excusable neglect, as it is

21

in their collective interests to accept the default rather than fight this litigation.  That's because the

22

Defendants have no desire to litigate in public the facts concerning their individual relationships

23

with Girardi and his Cabal.  *See* Complaint at 7-8.   Recent events at the United States Supreme

24

Court level have increased the negative financial and other consequences for the Defendants if

25

their relationship with Girardi is investigated.  The recent disclosures of luxury trips and other

26

benefits received but not disclosed by Justices Alito and Thomas have ignited a firestorm of

27

criticism and legislative activity.  Those hostile to the judicial decisions of these two justices have

28

used these revelations as cudgels to attack the legitimacy of such decisions. *See, e.g.,* "Alexandria

MEMORANDUM OF POINTS AND AUTHORITIES

Ocasio-Cortez says justices are 'destroying the legitimacy' of the Supreme Court", *cnn.com,*
*supra;* D. Lithwick, M.J. Stern, "The Time of Alito's Private Jet Scandal Couldn't Be More
Damning," *slate.com,* June 26, 2023 at slate.com/news-and-politics/2023/06/alito-private-jet-
defense-supreme-court-hypocrisy.html.  The usual shield from such challenges via collateral
attack, *Younger* abstention, is not available here, for the reasons discussed elsewhere.  Litigating
the merits of Sanai's complaint will focus attention on Girardi's relationships with them and
result, either in discovery or independent press investigation, in revelations that may force the
Democratic leadership in California to press for those Defendants implicated in Girardi's largesse
to resign or face investigation by relevant regulatory authorities such as the California Judicial
Performance Commission or the Fair Political Practices Commission.  Not appearing in this case,
by contrast, will result in judgment and/or injunctions that cannot be utilized by anyone other than
Sanai.

    Therefore this factor points in Sanai's favor.

### 6. The Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits

    This *Eitel* factor was addressed in *PepsiCo*, *supra* as follows:

> "Cases should be decided upon their merits whenever reasonably possible."
> *Eitel,* 782 F.2d at 1472. However, the mere existence of Fed.R.Civ.P. 55(b)
> indicates that "this preference, standing alone, is not dispositive." *Kloepping,*
> 1996 WL 75314, at *3. Moreover, Defendant's failure to answer Plaintiffs'
> Complaint makes a decision on the merits impractical, if not impossible. Under
> Fed.R.Civ.P. 55(a), termination of a case before hearing the merits is allowed
> whenever a defendant fails to defend an action. Thus, "the preference to decide
> cases on the merits does not preclude a court from granting default judgment."
> *Kloepping,* 1996 WL 75314, at *3. Accordingly, the court is not precluded from
> entering default judgment against Defendant.

*PepsiCo, supra* at 1177.

    The *PepsiCo* analysis on this factor applies equally to this case as well.

    Of the seven *Eitel* factors, six clearly point in the direction of granting a default judgment
and one probably points in that direction.  Even if the excusable neglect factor pointed the other
way, entry of a default judgment is clearly called for.

### D.    The Relief Sought

### 1.    Relief is Addressed after the *Eitel* Factors.

In *PepsiCo, supra,* the district court explained that

> Plaintiffs' demand for relief must be specific, pursuant to Fed.R.Civ.P.
> 8(a)(3). As discussed above, and further below, Plaintiffs seek only a permanent
> injunction barring Defendant's use of their trademark on counterfeit products. The
> relief sought is consistent with the relief requested in the Complaint.

*PepsiCo, supra,* at 1178.

Sanai clearly explained the relief sought in his complaint in paragraphs 65 to 72.  It consists of declaratory relief under 42 U.S.C. §1983 and the Declaratory Judgment Act, and injunctive relief under the common law *Ex Parte Young* remedy.  The relief requested by this motion is the same as or consistent with what was requested in the complaint with one exception. Plaintiff is requesting an evidence preservation order as to video surveillance records of the Clerk's office and Supreme Court public areas for the date on which the complaint was physically served.  This is to ensure that the Defendants (or possibly the clerk responsible for processing these documents who may have neglected their duties) do not erase the evidence of the service in their possession and then seek to argue that no service was made.

Sanai's original motion did not include a detailed analysis of the requirements for specific remedies because it is not part of the *Eitel* factors.  However, in one published decision in the Northern District the magistrate court judge performed a brief equitable remedies analysis AFTER finding that the *Eitel* factors required entry of default judgment in favor of the plaintiff.

> Having determined that default judgment should be granted, the undersigned must
> next evaluate Plaintiff's requests for relief….In its First Amended Complaint,
> Plaintiff requests that the Court issue a permanent injunction against
> Defendants…..The undersigned will evaluate each of Plaintiff's requests in turn.

*Craigslist, Inc. v. Naturemarket, Inc.,* 694 F. Supp. 2d 1039, 1061 (N.D. Cal. 2010)

Any analysis of the proper remedy comes after determination that a default judgment should be entered in favor of the plaintiff.  *Id.*  The analysis is relevant in this case because the Court can grant one or both of a declaratory judgment and injunction.

1

2            **2.**       **Declaratory Relief Should be Granted.**

3

4        Case law involving declaratory relief requests often discuss the *Brillhart* factors.  The

Supreme Court explained that:

5

6          this Court held that, "[a]lthough the District Court had jurisdiction of the suit under
the Federal Declaratory Judgments Act, it was under no compulsion to exercise that

7          jurisdiction." *Id.,* at 494. The Court explained that "[o]rdinarily it would be
uneconomical as well as vexatious for a federal court to proceed in a declaratory

8          judgment suit where another suit is pending in a state court presenting the same
issues, not governed by federal law, between the same parties." *Id.,* at 495. The

9          question for a district court presented with a suit under the Declaratory Judgment
Act, the Court found, is "whether the questions in controversy between the parties

10         to the federal suit, and which are not foreclosed under the applicable substantive
law, can better be settled in the proceeding pending in the state court." *Ibid.*

11 *Wilton v. Seven Falls Co.,* 515 US 277, 282 (1995), *discussing Brillhart v. Excess Ins. Co.,* 316 U.

12 S. 491 (1942).

13         *Wilton* made clear that the discretion of a federal court to deny a declaratory

14 judgment is premised on the disputed issues being governed by state law.  At the end of *Wilton,*

15 the Supreme Court underlined this point: "We do not attempt at this time to delineate the outer

16 boundaries of that discretion in other cases, for example, cases raising issues of federal law or

17 cases in which there are no parallel state proceedings." *Id.* at 290.  *See also Ameritas Variable Life*

18 *Ins. Co. v. Roach,* 411 F.3d 1328, 1330 (11th Cir. 2005) (court should consider declining

19 declaratory relief remedy only when "another suit is pending in a state court, presenting the same

20 issues, not governed by federal law, between the same parties."); *Chamberlain v. Allstate Ins. Co.,*

21 931 F.2d 1361 (9th Cir.1991) (multifactor balancing only where no federal issues); *Knick v. Twp.*

22 *of Scott,* 139 S. Ct. 2162, 2167 (2019)("The Civil Rights Act of 1871, after all, guarantees "a

23 federal forum for claims of unconstitutional treatment at the hands of state officials" … the

24 guarantee of a federal forum rings hollow for … plaintiffs, who are forced to litigate their claims

25 in state court.").

26       The *Younger* analysis discussed above also answers the issue of declaratory relief.  The

27 *Brillheart* factors enumerate matters to be addressed by the federal court in deciding whether the

28 issues presented in the declaratory judgment suit should be addressed in state court instead.

*Younger* turbo-charges that question into a presumption, and gives the federal court no discretion to refrain from issuing a declaratory judgment unless the state court cannot address federal issues due to a procedural bar or the state tribunal cannot fairly decide federal issues because of exceptional circumstances such as actual or constitutional bias. *Gibson, supra*. Here both are true.

Since the procedural bar placed by the California Supreme Court renders that court incompetent to address the federal issues, declaratory relief is authorized.

### 3.    Injunctive Relief Should be Granted.

As discussed above, 42 U.S.C. §1983 states that persons "shall be liable to the party injured in an action at law, suit in equity…except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." The Defendants are unquestionably judicial officers. However, United States Supreme Court authority holds that state Supreme Courts act in a prosecutorial function if they have the independent power to prosecute attorneys, which is the case in California. *Supreme Court of Virginia v. Consumers Union of United States, Inc.,* 446 U. S. 719. 736 (1980). In light of this authority, the priority of remedies that normally applies in 42 U.S.C. §1983 may not apply.

42 U.S.C. §1983 by its own terms does not apply to the equitable *Ex Parte Young* remedy. *Armstrong , supra,* at 1384.   In *Armstrong,* the Supreme Court stated that this remedy is properly characterized as the equitable cause of action "to prevent an injurious act by a public officer" and is part of a "long history of judicial review" that goes back to England. *Id. quoting Carroll v. Safford,* 3 How. 441, 463, 11 L.Ed. 671 (1845).   Any contention that the limitation in 42 U.S.C. §1983 applies here is foreclosed because the "act or omission" must be performed in the "judicial capacity" of the judicial officer; *Supreme Court of Virginia* explicitly holds that the attorney regulatory function is deemed enforcement and not adjudicative.

In *Supreme Court of Virginia* the Supreme Court was directly presented with the question of how to characterize attorney regulation for purposes of immunity: is it legislative, prosecutorial or judicial.  This case was decided four years before the Supreme Court decided *Pulliam*, *supra*, so the question of judicial immunity against 42 U.S.C. §1983 lawsuits was not then decided.  The Supreme Court held that if the state High Court had the power to initiate and conduct attorney discipline on its own, then the prosecutorial standard applied.  Since California's Supreme Court has the same power, as a matter of binding precedent the attorney discipline function is classified as prosecutorial.[1]

> As already indicated, § 54-74 gives the Virginia Court independent authority of its own to initiate proceedings against attorneys. For this reason the Virginia Court and its members were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were.

*Supreme Court of Virginia, supra,* at 736.

The independent authority of the California Supreme Court to initiate and prosecute attorney discipline matters is recognized by:

    i.       Court rule, Cal. R. Ct.  9.10(g) Inherent Powers of Supreme Court: ("Nothing in these rules may be construed as affecting the power of the Supreme Court to exercise its inherent jurisdiction over the lawyer discipline and admissions system.");

    ii.      statute: Cal. Bus. & Prof. Code §6100 ("For any of the causes provided in this article, arising after an attorney's admission to practice, he or she may be disbarred or suspended by the Supreme Court. Nothing in this article limits the inherent

---

[1] The United States Supreme Court's approach, though not articulated explicitly, is that the where more than one function is exercised, the LEAST protective immunity applies.  In *Supreme Court of Virginia*, the Virginia Supreme Court performed all three functions as it created the attorney discipline rules (legislative functionality, *id.* at 721-2), could enforce them (prosecutorial functionality, *id.* at 736) and could adjudicate them (judicial functionality, *id.* at 724). The Court held that since the Virginia Supreme Court could initiate attorney discipline proceedings, it was subject to injunctive relief under 42 U.S.C. §1983 since prosecutors are not immune to such relief. The California Supreme Court has the same prosecutorial powers.

1    power of the Supreme Court to discipline, including to summarily disbar, any

2    attorney."); and

3        iii.    case law: *In re Rose,* 22 Cal. 4th 430, 436 (2000).

4    Accordingly, injunctive relief is available under *Supreme Court of Virginia*, since the

5    California Supreme Court has the same inherent power to initiate discipline as the the Virginia

6    Court

7    A court must consider four factors when deciding whether to grant a permanent injunction.

8    First, and easiest to determine, is whether the plaintiff has succeeded on the merits; the other three

9    are "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance

10   of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural*

11   *Resources Defense Council,* 555 U.S. 7, 20 (2008); *see also Amoco Production Co. v. Gambell,*

12   480 U.S. 531 (1987)

13   Determination of whether Sanai succeeds on the merits is evaluated on the *Eitel* factors, as

14   discussed above.  All factors point to Sanai prevailing.

15   Constitutional injuries constitute irreparable harm.  *Monterey Mech. Co. v. Wilson*, 125 F.3d

16   702, 715 (9th Cir. 1997) (noting that "'an alleged constitutional infringement will often alone

17   constitute irreparable harm'"); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other*

18   *grounds*, *Nat'l Aero. & Space Admin. v. Nelson*, 562 U.S. 134, 131 S.Ct. 746, 178 L.Ed.2d 667

19   (2011) (stating that, "[u]nlike monetary injuries, constitutional violations cannot be adequately

20   remedied through damages and therefore generally constitute irreparable harm").  The Defendants

21   argue that "''a party is not entitled to a preliminary injunction unless he or she can demonstrate

22   more than simply damages of a pecuniary nature." *Regents of Univ. of Cal. v. Am. Broad. Cos.,*

23   *Inc.,* 747 F.2d 511, 519 (9th Cir. 1984)."  The "more" consists of monetary injuries that are not

24   "fully compensable in monetary terms."  Here the Defendants immunity from damages constitutes

25   the "more". *Id.* at 520; *Hirsh v. Justices of Supreme Court of California,* 67 F.3d 708, 715 (9th

26   Cir. 1995).  While Sanai was unable to articulate the amount of losses when he filed the motion,

27

28

MEMORANDUM OF POINTS AND AUTHORITIES

he now can articulate two lost matters worth at least $55,000 in fees if relief is not granted. Sanai Decl. hereto at ¶31.

As to balance of equities, the Defendants suffers no hardship from attorney discipline not being imposed on Sanai.  In the attorney regulation arena, the California Supreme Court is deemed to have the interests and immunity of a prosecutor because it has the independent power to discipline attorneys—indeed, under the California system, it has the ONLY power to do so, as the State Bar is merely an administrative advisory body.

On public interest, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio,* 695 F.3d 990, 1002(9th Cir. 2012), *citing Sammartano v. First Judicial District Court,* 303 F.3d 959, 974 (9th Cir.2002), quoting that "`it is always in the public interest to prevent the violation of a party's constitutional rights.'" *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994).

The last two factors analyze somewhat differently as to the injunction to preserve and hand over the video surveillance footage of the personal service on the Defendants' clerk.  This injunction is requested to safeguard against a change against the possibility that Sanai's inference about the Defendants' position on this litigation is wrong, or that it is correct now but changes. No injury is suffered by handing over footage of public spaces, and it is always in the public interest to have free access to video records of public spaces.

## VI.    WHY EMERGENCY RELIEF IS NECESSARY

Emergency relief is necessary because Sanai will suffer and is suffering irreparable injury. Sanai Decl. hereto at ¶31.

Sanai is suffering irreparable injury each day as he was not granted relief effective by June 30, 2023 which was the finality date for his suspension order. *See* Exh. 8 Vol. VI at 1532; Sanai Decl. hereto at ¶31.  The State Bar compounded the irreparable harm accelerating the order's practical effect by falsely stating in Sanai's Bar profile that he was *already* ineligible to practice law, months before the June 30, 2023 ordered date, and notifying the Ninth Circuit within hours of the

entry of the Supreme Court's orders even before they took effect. *See* Exhs. 9-10 Vol. VI at 1533-7; C. Sanai Decl. herewith ¶31 at 5.

The reason that the Ninth Circuit was the focus of the State Bar's efforts to disqualify Sanai early is because Sanai was set to make similar arguments in Mr. Roshan's case on his State Bar suspension on July 21, 2023.

In light of the State Bar's efforts to mislead the public and other courts, Sanai needed relief as soon as possible. Accordingly, he requested that the Court set a hearing if it needs clarification on any matter, or enter the default judgment, on or before June 29, 2023. That did not happen. He also was not granted relief by June 29, 2023. As a result he had to withdraw his first version of this motion and update and expand it. He now needs relief as soon as possible such as by July 12, 2023. If the Court is unable to process this amended motion by that time it can grant relief in the motion for interim relief to be filed soon after this motion.

## VII.    CONCLUSION

The Court should enter the default judgment by July 12, 2023 or a hearing by such date to address any issues in this motion. A proposed order is attached herewith and submitted to this Court's email.

Dated:  July 10, 2023

By: _____/s/ Cyrus Sanai_____
            CYRUS SANAI
            Counsel to Plaintiff

MEMORANDUM OF POINTS AND AUTHORITIES